[S. F. No. 23619. Jan. 19, 1978.]

*JOHN HENRIOULLE, Plaintiff and Appellant, v.
MARIN VENTURES, INC., Defendant and Respondent.

*Reporter's Note: This case was previously entitled "Henrioulle v. Dreyer."

COUNSEL

Stanley A. Feingold and Allan J. Lipney for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, E. Clement Shute, Jr., Assistant Attorney General, Herschel T. Elkins and Albert Norman Shelden, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

David P. Freitas and Freitas, Allen, McCarthy, Bettini & MacMahon for Defendant and Respondent.

OPINION

**BIRD, C. J.**—Appellant, John Henrioulle, seeks to set aside orders of the superior court granting his landlord, respondent Marin Ventures, Inc., a

judgment notwithstanding the jury's verdict and a new trial. Appellant contends that the exculpatory clause in his lease could not relieve the landlord of liability for the personal injuries appellant sustained in a fall on a common stairway in the apartment building. This court agrees.

I

When reviewing the validity of a judgment notwithstanding the verdict, an appellate court must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict. (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161]; *Estate of Franco* (1975) 50 Cal.App.3d 374, 377 [123 Cal.Rptr. 458].) From the record, it appears that on April 3, 1974, appellant entered into a lease agreement with respondent for an apartment in San Rafael, California. At that time, appellant was an unemployed widower with two children who received public assistance in the form of a rent subsidy from the Marin County Department of Social Services. There was also evidence of a shortage of housing accommodations for persons of low income in Marin County.[1]

The printed form lease agreement which appellant signed contained the following exculpatory clause: "INDEMNIFICATION: Owner shall not be liable for any damage or injury to Tenant, or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, and Tenant agrees to hold Owner harmless from any claims for damages no matter how caused."

On May 22, 1974, appellant fractured his wrist when he tripped over a rock on a common stairway in the apartment building. At the time of the accident the landlord had been having difficulty keeping the common areas of the apartment building clean. An on-site manager, whose duties included keeping these areas clean, had proven unsatisfactory and had been terminated in the month prior to the accident. The landlord had also employed an additional person to do maintenance work, but he had worked only a few hours at the apartment building in the month preceding the accident.

---

[1]The Marin County Planning Department in its 1973 countywide plan report documents the relative decline in the amount of low-cost housing available in that county. That report indicates that between 1960 and 1970 the proportion of the county's housing in the low-price category decreased from 41.8 percent to 19.4 percent. (The Marin Countywide Plan, 1973, Marin County Planning Dept.)

A personal injury action was filed on August 23, 1974.[2] After a three-day trial, the jury rendered a special verdict under Code of Civil Procedure section 624, consisting of four findings of fact: (1) appellant had been injured as a proximate result of respondent's negligence; (2) appellant was damaged in the sum of $5,000; (3) appellant had been contributorily negligent; and (4) relative fault was to be apportioned at 30 percent for appellant and 70 percent for respondent.[3] After the verdict, the jurors were polled at respondent's request. Initially only eight jurors stated that they had voted in accord with the announced verdict. Expressing surprise at the results of the poll, the jury foreperson volunteered that in separate votes nine or more jurors had concurred as to each of the four questions. The court then asked for a show of hands of those who had "voted in favor of a verdict for the plaintiff," and nine jurors raised their hands. When the jury was polled on the three remaining findings, it developed that although at least nine jurors had concurred as to each finding, they were not always the same nine jurors.

After a discussion with counsel at the bench, the court, without objection from either party, made one last attempt to clarify the verdict. It asked for a show of hands on the initial finding for appellant and noted that jurors Holmes, Andries and Hoffman dissented. Then, treating the other three questions as special findings, the court asked for

[2] Appellant filed suit against Marin Ventures, Inc., owner of the apartment building; Dreyer-Wilson, Inc., rental agent for the property; and George Dreyer, an officer of these two corporations. Motions for nonsuit were granted in favor of Dreyer and Dreyer-Wilson, Inc. The propriety of these nonsuits is not challenged.

[3] The verdict form provided:

"We, the Jury in the above-entitled cause, find that plaintiff was injured as a proximate result of the negligence of the defendant. In addition we make the following special findings:

"QUESTION NO. 1: Without taking into consideration the question of reduction of damages due to the negligence of the plaintiff, if any, what did you find to be the total amount of plaintiff's damages proximately resulting from the accident in question?

"ANSWER  $  5,000.00

"QUESTION NO. 2: Was there negligence on the part of the plaintiff which contributed as a proximate cause of his injury?

"ANSWER  'yes' or 'no'.  ANSWER  Yes

"If your answer to Question No. 2 is 'no', then you will not answer Question No. 3, since the amount of damages set forth in your answer to Question No. 1 is the amount of your verdict.

"If your answer to Question No. 2 is 'yes', you are instructed to answer Question No. 3.

"QUESTION NO. 3: The combined negligence of the plaintiff and of the defendants whose negligence proximately contributed to the injury being 100%, what proportion of such combined negligence is attributable to such defendant?

"ANSWER:  To Plaintiff      30      %
To Defendants    70      %
                 100     %"

a show of hands as to each one. The vote was eleven to one that appellant's damages amounted to $5,000, and the court noted the dissenter was juror Holmes. The vote was nine to three that appellant was contributorily negligent and ten to two on the relative fault of each party. The record does not specify which jurors dissented on the last two questions. The court then stated a verdict had been reached and judgment would be entered for appellant in the sum of $3,500. At this point, the jury was discharged.

Thereafter, respondent moved for judgment notwithstanding the verdict, contending that the exculpatory clause in the rental agreement relieved it of liability.[4] This motion was granted. Respondent's additional motion for a new trial under Code of Civil Procedure section 629 was granted on the ground that the same nine jurors had not assented to each and every question set forth in the special verdict and, therefore, no verdict had been reached. This appeal followed.

II

In *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693], this court held invalid a clause in a hospital admission form which released the hospital from liability for future negligence.[5] This court noted that although courts have made "diverse" interpretations of Civil Code section 1668,[6] which invalidates contracts which exempt one from responsibility for certain wilful or negligent acts, all the decisions were in accord that exculpatory clauses affecting the public interest are invalid. (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d at pp. 94-98.)

---

[4]Respondent had moved for nonsuit on the same ground at the close of appellant's case. The motion was denied without prejudice to raising it on a motion for judgment notwithstanding the verdict.

[5]The pertinent provision in the hospital admission form read as follows: " 'RELEASE: The hospital is a nonprofit, charitable institution. In consideration of the hospital and allied services to be rendered and the rates charged therefor, the patient or his legal representative agrees to and hereby releases The Regents of the University of California, and the hospital from any and all liability for the negligent or wrongful acts or omissions of its employees . . . .' " (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d at p. 94.)

[6]Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or wilful injury to the person or property of another, or violation of law, whether wilful or negligent, are against the policy of the law."

■ In *Tunkl,* six criteria are used to identify the kind of agreement in which an exculpatory clause is invalid as contrary to public policy. "[1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id.,* at pp. 98-101, fns. omitted.)

The transaction before this court, a residential rental agreement, meets the *Tunkl* criteria. Housing in general, and residential leases in particular, are increasingly the subject of governmental regulation, the first of the *Tunkl* criteria. In *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 627 [111 Cal.Rptr. 704, 517 P.2d 1168], this court noted: "The past half century has brought the widespread enactment of comprehensive housing codes throughout the nation; in California, the Department of Housing and Community Development has established detailed, statewide housing regulations (see Health & Saf. Code, § 17921; Cal. Admin. Code, tit. 25, §§ 1000-1090), and the Legislature has expressly authorized local entities to impose even more stringent regulations. (See Health & Saf. Code, § 17951.) These comprehensive housing codes affirm that, under contemporary conditions, public policy compels landlords to bear the primary responsibility for maintaining safe, clean and habitable housing in our state." Moreover, the Legislature in 1970 enacted stricter standards of "tenantability" (see Civ. Code, § 1941.1) and has limited landlords' ability to impose waivers of tenants' rights in leases. (See, e.g., Civ. Code, §§ 1942.1, 1953, 1954.)

A lessor of residential property provides shelter, a basic necessity of life, the second *Tunkl* criterion. Moreover, the landlord in this case offered to rent his units to all members of the public, the third *Tunkl* criterion.

Unequal bargaining strength, the fourth *Tunkl* criterion, is also present. In a state and local market characterized by a severe shortage of low-cost housing,[7] tenants are likely to be in a poor position to bargain with landlords. As this court observed in *Green,* "the severe shortage of low and moderate cost housing has left tenants with little bargaining power through which they might gain express warranties of habitability from landlords . . . ." (*Green* v. *Superior Court, supra,* 10 Cal.3d at p. 625.)

Finally, the fifth and sixth *Tunkl* criteria are also present. Thus, it does not appear that respondent made any "provision whereby a purchaser may pay additional fees and obtain protection against negligence," (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d at pp. 100-101) and appellant was exposed to the risk of injury through respondent's carelessness.

However, respondent asserts that the principles discussed in *Tunkl* do not apply to private residential leases. It is true that *Tunkl* cites language in *Barkett* v. *Brucato* (1953) 122 Cal.App.2d 264, 276 [264 P.2d 978], to the effect that "the relationship of landlord and tenant does not affect the public interest . . . ." In *Tunkl,* this court cited *Barkett* and other cases as examples of the uniform inquiry by courts into whether or not an exculpatory clause involved the public interest. Although this court held that an exculpatory clause could stand only if it did *not* involve the public interest, it did *not* endorse the result reached in applying that rule in each of those cases.

Furthermore, even if at the time of *Barkett* and the earlier decisions cited therein, a residential lease may have been correctly characterized as not involving the public interest, for the reasons stated above this court is convinced this is not true today. Since the residential lease transaction entered into by the parties exhibits all of the characteristics of a relationship that "affects the public interest" under *Tunkl,* the exculpatory clause cannot operate to relieve the landlord of liability in this case.

In holding that exculpatory clauses in residential leases violate public policy, this court joins an increasing number of jurisdictions. (See, e.g.,

---

[7]The statewide shortage of such housing was documented by the Legislature in 1970: "[The Legislature] finds and declares that there continues to exist throughout the state a seriously inadequate supply of safe and sanitary dwelling accommodations for persons and families of low income. This condition is contrary to the public interest and threatens the health, safety, welfare, comfort and security of the people of this state." (Health & Saf. Code, § 33250; see also fn. 2, *ante.*)

*Kuzmiak* v. *Brookchester, Inc.* (1955) 33 N.J.Super. 575 [111 A.2d 425]; *Old Town Development Company* v. *Langford* (1976) — Ind.App. — [349 N.E.2d 744]; *Weaver* v. *American Oil Company* (1971) 257 Ind. 458 [276 N.E.2d 144, 49 A.L.R.3d 306] (such clauses are void in all leases); *Papakalos* v. *Shaka* (1941) 91 N.H. 265 [18 A.2d 377, 379] (such clauses are void in all contracts); *Billie Knitwear, Inc.* v. *New York Life Ins. Co.* (1940) 174 Misc. 978 [22 N.Y.S.2d 324], affd. (1942) 288 N.Y. 682 [43 N.E.2d 80] (such clauses invalidated by statute in all leases); see generally, Annot., Validity of Exculpatory Clause in Lease Exempting Lessor from Liability (1971) 49 A.L.R.3d 321.) Indeed, in 1975 the California Legislature enacted Civil Code section 1953, which declared invalid exculpatory clauses in residential leases executed on or after January 1, 1976. (Civ. Code, § 1953, Stats. 1975, ch. 302, § 1, p. 749.)[8]

■ Respondent contends that by enacting Civil Code section 1953, the Legislature impliedly sanctioned such clauses in leases executed before that date. However, this argument ignores the fact that appellant based his cause of action not on Civil Code section 1953, but on the common law as it existed prior to the passage of that section. Further, nothing in the legislative history of section 1953 suggests that the Legislature intended, in enacting that section, to expand tenants' rights prospectively while curtailing their common law rights with respect to transactions occurring before enactment of that section.[9]

This court has consistently held that a statute should not be given retroactive effect so as to deprive an individual of a pre-existing right unless the Legislature has clearly expressed its intention to accomplish that end. (See, e.g., *Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828-829 [114 Cal.Rptr. 589, 532 P.2d 629]; *County of Los Angeles* v. *Superior Court* (1965) 62 Cal.2d 839, 844-845 [44 Cal.Rptr. 796, 402 P.2d 868]; *Douglas Aircraft Co.* v. *Cranston* (1962) 58 Cal.2d 462, 465 [24

---

[8]Civil Code section 1953 provides in pertinent part:

"(a) Any provision of a lease or rental agreement of a dwelling by which the lessee agrees to modify or waive any of the following rights shall be void as contrary to public policy:

". . . . . . . . . . . . . . . . . .

"(5) His right to have the landlord exercise a duty of care to prevent personal injury or personal property damage where that duty is imposed by law.

". . . . . . . . . . . . . . . . . .

"(c) This section shall apply only to leases and rental agreements executed on or after January 1, 1976."

[9]In *Green*, this court rejected a similar argument that the Legislature, in enacting Civil Code section 1941 et seq. (the "repair and deduct" provisions) had intended to displace the common law remedies of tenants faced with untenantable dwellings. (*Green* v. *Superior Court, supra*, 10 Cal.3d at pp. 629-631.)

Cal.Rptr. 851, 374 P.2d 819, 98 A.L.R.2d 298].) Although section 1953 invalidates exculpatory clauses in leases executed after January 1, 1976, there is no indication that the Legislature intended to alter or modify the common law principles the courts applied on a case-by-case basis to leases executed before that date. Therefore, the exculpatory clause in this lease is unenforceable under the common law principles prevailing when the lease was executed. The judgment notwithstanding the verdict must be set aside.

## III

■ Respondent was granted a new trial based on the trial court's conclusion that since the same nine jurors did not assent to each question of the special verdict, the jury failed to return a proper verdict. Appellant correctly contends, however, that this objection to the verdict was waived when respondent failed to object, following the second poll of the jury, that a proper verdict had not been reached. Respondent's failure to question the verdict at that time precluded any possibility of resolving the ambiguity by sending the jury back for further deliberation pursuant to Code of Civil Procedure section 618.[10]

Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.[11]

---

[10]Code of Civil Procedure section 618 provides: "When the jury, or three-fourths of them, have agreed upon a verdict, they must be conducted into court, their names called by the clerk, or by the court if there be no clerk, and the verdict rendered by their foreman. The verdict must be in writing, signed by the foreman, and must be read to the jury by the clerk, or by the court if there be no clerk, and the inquiry made whether it is their verdict. Either party may require the jury to be polled, which is done by the court or clerk, asking each juror if it is his verdict. If upon such inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, but if no such disagreement be expressed, the verdict is complete and the jury discharged from the case."

Thus, the trial court erred, in stating in its minute order granting the motion for a new trial, that a mistrial should have been declared when it appeared nine identical jurors did not agree on each question set forth in the special verdict. Section 618 clearly provides that at that point the jury should have been sent out for further deliberation. (See *Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022 [98 Cal.Rptr. 187, 54 A.L.R.3d 250].)

[11]This principle does not apply when the verdict itself is inconsistent. For example, in *Remy* v. *Exley Produce Express, Inc.* (1957) 148 Cal.App.2d 550 [307 P.2d 65], the jury held one defendant negligent as to plaintiff but not negligent as to another party, an impossibility under the facts of that case. Although not called to the attention of the trial court, the alleged error was considered on appeal. In the instant case, although some jurors may have voted inconsistently, the verdict itself is not inconsistent.

For example, in *Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d 1022, the jury returned a verdict in favor of defendant. When polled, eight jurors said the verdict was theirs, three said it was not and one said "Yes, I voted." After the judge explained that he was asking whether each juror had personally voted for the verdict, the jurors were polled again, ten stating they were in favor of the verdict and two against. On appeal, plaintiff contended the court erred in not sending the jury out for further deliberation when some of the jurors expressed confusion with respect to the polling procedure. The court held: "[W]e first observe that no objection was made by plaintiff's counsel to the polling procedure at the time the jury was polled, nor did her counsel suggest that the jury be sent out again on the ground that more than one-fourth of the jurors disagreed with the verdict as returned. If plaintiff's counsel was not satisfied with the polling procedure, or if he believed that the jury was still confused, he should have complained immediately. Since any impropriety could have been cured if raised on time, the failure to object amounted to a waiver of the alleged impropriety or error." (*Id.,* at p. 1029; see also *Kirby* v. *Adcock* (1953) 116 Cal.App.2d 570, 571 [253 P.2d 700]; *Brown* v. *Regan* (1938) 10 Cal.2d 519, 523-524 [75 P.2d 1063].)

In this case the alleged defect which respondent cites was apparent at the time the jury was polled and could have been cured by further deliberation. Accordingly, respondent's failure to object at that time waived the alleged defect and precluded the trial court from invoking it to grant a new trial. Therefore, this court need not reach the question of whether or not the same nine jurors must agree on each part of a special verdict.

The orders of the superior court granting respondent's motions for judgment notwithstanding the jury's verdict and a new trial are reversed, and the cause is remanded with direction to enter judgment for appellant on the verdict.

Tobriner, J., Mosk, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.