[Crim. No. 40501. Second Dist., Div. One. May 28, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JAN ROBERT CONRAD, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Kelvin D. Filer, Deputy Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COOPERMAN, J.***—Defendant was charged by the District Attorney of Los Angeles County with the murder of Rosanda Skarlovik, on August 14, 1980, (violation of § 187, Pen. Code), and with assault by means of force likely to produce great bodily injury with deadly weapon, and with intent to commit murder, upon Marina Conrad, on the same date. (Violation of § 217, Pen. Code.)

Defendant entered a plea of not guilty to the foregoing charges on September 15, 1980. On October 8, 1980, Judge Bernard S. Selber granted defendant's motion to proceed in propria persona, and relieved the public defender of duties as counsel for defendant.

The case was called for trial on January 26, 1981, before Judge George M. Dell. Defendant, representing himself, requested the court to dismiss the case against him, alleging that the Los Angeles County Sheriff had stolen his legal papers and evidence, that the alleged victim of the felonious assault, Marina Conrad, was actually the criminal, and defendant the victim, and, further, that Marina Conrad was part of an alleged communist conspiracy to murder the defendant and to attempt to murder the President of the United States.

The trial judge, in response to the foregoing allegations, indicated that he had a doubt as to the mental competence of the defendant, and, under the provisions of section 1368 and 1369 of the Penal Code, suspended criminal proceedings and appointed Alfred Coodley, M.D., and Alex Lieberman, M.D., to examine defendant as to his mental competence. The court further revoked defendant's pro. per. status until the matter of his competency was determined, reappointed the public defender to represent him, and continued the matter for further proceedings on February 26, 1981. Neither the prosecutor nor defense counsel made a request for appointment of an alienist, as is allowed under Penal Code section 1369.

On February 26, 1981, the court, having previously received the reports of Drs. Coodley and Lieberman, ordered a competency trial under the provisions of sections 1368.1 and 1369, Penal Code. Upon demand of the defendant, the court ordered that said trial be by jury. The case was continued to March 2, 1981.

---

*Assigned by the Chairperson of the Judicial Council.

The competency trial actually ensued on March 3, 1981. Following impanelment of the jury, and opening statements, counsel for defendant offered no evidence. Thereupon, the prosecutor presented the testimony of Drs. Coodley and Lieberman on the issue of defendant's present mental competence (see § 1369, subds. (b)(2), and (c), Pen. Code).

Dr. Coodley testified that defendant was psychotic and, as a consequence, was unable to cooperate with counsel in a reasonable and rational manner. Dr. Coodley was also of the opinion that defendant did not have the capacity to conduct his own defense in a rational manner if he were permitted to represent himself.

Dr. Lieberman testified that defendant suffered from psychosis, that he would be unable to cooperate with counsel, and that it would be difficult for him to conduct his defense, acting as his own attorney. Dr. Lieberman also testified that defendant would be incompetent to stand trial because he did not have a full understanding of the court proceedings.

Thereafter, defendant testified, out of order, on his own behalf, in rebuttal, following which Dr. Lieberman was recalled to provide further testimony, as a witness for the prosecution.

Dr. Lieberman, after listening to defendant testify, was of the opinion the defendant *did* understand the nature of the proceedings against him. However, Dr. Lieberman continued to be of the opinion that defendant could not cooperate with counsel. Both sides then rested.

On March 4, 1981, the case was argued and the jury thereafter instructed by the court. The jury gave its verdict the same day, finding defendant to be mentally competent.

On March 5, 1981, the minute order indicates the presence of defendant, in propria persona, and the giving by the court to defendant of oral notice that it was considering rendering a judgment notwithstanding the verdict, under the provisions of the Code of Civil Procedure, section 629.

On April 3, 1981, the court caused to be filed a judgment on verdict in open court, reflecting the jury determination on March 4, 1981, of defendant's mental competence. Notice of entry of judgment was given defendant.

On April 10, 1981, the court caused to be served upon defendant, written notice of the court's own motion for judgment declaring defendant mentally incompetent, notwithstanding the jury verdict on March 4, 1981, to the contrary. The district attorney and public defender also received copies of the foregoing notice of motion.

On April 21, 1981, the court, pursuant to Code of Civil Procedure section 629, ordered a judgment of mental incompetence with respect to defendant entered, notwithstanding the verdict of the jury. The judgment of mental competence filed April 3, 1981, was vacated and set aside. The court indicated that its action was based upon a review of all the evidence at the competency hearing, and its finding that there was no substantial evidence to support the verdict of the jury that defendant was competent.

The court also reappointed the public defender as counsel for defendant and took the following actions:

(a) Ordered that Alfred Coodley, M.D., and Alex Lieberman, M.D., be deemed designees of the Los Angeles County Mental Health Service Department, and indicated that it had read and considered their respective reports;

. (b) Ordered defendant committed to the State Department of Developmental Services for placement at Patton State Hospital, pursuant to Penal Code section 1370.

Defendant has appealed from the judgment of mental incompetence to stand trial rendered by the trial court, notwithstanding the verdict of the jury.

## Issues

Appellant makes the following contentions.

1. The trial court lacked jurisdiction to render a judgment notwithstanding verdict under Code of Civil Procedure section 629;

2. Assuming, arguendo, that the trial court had the jurisdiction to act under Code of Civil Procedure section 629, the court erred in so doing, in that there was sufficient evidence to support the jury finding that appellant was competent to stand trial.

## DISCUSSION

### I

It is appellant's position that the trial court lacked jurisdiction to order a judgment of mental incompetence entered, under the provisions of Code of Civil Procedure section 629, notwithstanding the jury verdict that appellant was mentally competent.

In essence, it is appellant's contention that the Penal Code procedure for the determination of a defendant's competency to stand trial does *not* provide for rendition, following jury trial, of a judgment notwithstanding verdict by the trial court. (See Pen. Code, § 1367 et seq.)

It is settled law that a person cannot be tried or sentenced while he or she is mentally incompetent. (Pen. Code, § 1367.) Section 1368, Penal Code, which procedurally implements section 1367, requires a court to institute proceedings to determine present sanity, if during the pendency of an action, and prior to judgment, a doubt arises in the mind of the trial judge as to the mental competence of defendant. The trial court lacks jurisdiction to try, judge, or sentence a defendant unless he or she is then presently sane. (See *Drope* v. *Missouri* (1975) 420 U.S. 162 [43 L.Ed. 103, 95 S.Ct. 896]; *In re Davis* (1973) 8 Cal.3d 798, 808 [106 Cal.Rptr. 178, 505 P.2d 1018]; *People* v. *Tomas* (1977) 74 Cal.App.3d 75, 87-88 [141 Cal.Rptr. 453].)

"The sanity requirement is satisfied only if an accused person is able to understand the nature of the proceedings against him or her, to consult with counsel, and to assist in preparing a rational defense. [Citations.]

"When facts giving rise to a doubt regarding a defendant's present sanity become known to a trial judge, due process requires that the court, on its own motion, suspend proceedings in the case until the question is determined in a sanity hearing. [Citation.]" (See *Tomas, supra,* at p. 88.)

Penal Code section 1368, subdivision (c), provides, subject to an exception not applicable here, that when a present mental competency hearing has been ordered, the criminal prosecution shall be suspended until the question of mental competence has been determined.

It has been held that the competency hearing is a special proceeding of a civil nature, collateral to the criminal proceedings. (*Posner v. Superior Court* (1980) 107 Cal.App.3d 928, 932 [166 Cal.Rptr. 123].)

The Legislature has recognized the civil nature of a competency proceeding by providing that proof of mental incompetence shall be by a preponderance of the evidence. (Pen. Code, § 1369, subd. (f).)

■ Given the *civil nature* of the competency hearing, and in the absence of contrary legal precedent or legislative prohibition, we hold that the trial court possessed the jurisdiction to utilize Code of Civil Procedure section 629 to render a judgment notwithstanding the jury verdict in the case at bench, if the use of such remedy was otherwise legally proper, an issue that will be hereinafter addressed.

Appellant points out that following the jury verdict determining that appellant was presently mentally competent, the criminal proceeding had been, in point of fact, resumed, and argues that it was erroneous for the trial court to utilize a civil statute (Code Civ. Proc., § 629), during the course of a criminal proceeding. Appellant contends that the only course of action then open to the trial judge was to declare a "brand new doubt" regarding appellant's competence, again suspend criminal proceedings, and conduct another sanity hearing under provisions of Penal Code section 1368 et seq.

Procedurally, it has been held that Code of Civil Procedure section 629 limits a trial court's power to rule on the motion in the following ways:

1. The trial court must enter judgment notwithstanding the verdict *before* expiration of its power to rule on a motion for a new trial. (See Code Civ. Proc., § 660.)

2. The trial court, acting on its own motion, can grant judgment notwithstanding verdict, only after giving five days' notice to the parties; and

3. The trial court can rule on a motion for judgment notwithstanding verdict only after the expiration of the time within which a motion for a new trial must be served and filed, which, according to Code of Civil Procedure section 659 is within 15 days of the date of mailing notice of

entry of judgment. (See *Sturgeon* v. *Leavitt* (1979) 94 Cal.App.3d 957, 963 [156 Cal.Rptr. 687].)

Since the trial court satisfied the foregoing procedural requisites, it is our determination that it is of no legal significance that the action of the trial court under Code of Civil Procedure section 629 did not occur until after the resumption of the criminal proceeding.

## II

Appellant contends that there was sufficient evidence to support the verdict of the jury that appellant was mentally competent to stand trial, and that the trial court judgment, notwithstanding the verdict, was erroneous.

The legal guidelines for California trial and appellate courts in dealing with motions for judgment notwithstanding verdict are set out in *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

█ The California Supreme Court held that such a motion may be properly granted only when, disregarding conflicting evidence, and indulging in every legitimate inference in favor of the party obtaining the jury verdict, it is determined that there is no evidence of substantial nature to support the verdict.

The Supreme Court stated in *Quintal, supra*, that the trial court, in such a matter, is not permitted to weigh the evidence. █ Further, on an appeal from the judgment entered on the granting of such a motion, the appellate court must read the record in the light most advantageous to the party against whom the judgment was rendered, resolve all conflicts in favor of such party, and draw all reasonable inferences in support of the jury's verdict. (See also, *Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 515 [143 Cal.Rptr. 247, 573 P.2d 465].)

█ The standards to be applied under Penal Code section 1367 et seq., in determining whether a person is mentally competent to stand trial or be adjudged to punishment are as follows:

1. The defendant must be capable of understanding the nature and purpose of the proceedings against him;

2. The defendant must comprehend his own status and condition in reference to such proceedings; and

3. The defendant must be capable to assist his attorney in conducting his defense, or be able to conduct his own defense in a rational manner (see also, *People* v. *Pennington* (1967) 66 Cal.2d 508, 518-519 [58 Cal.Rptr. 374, 426 P.2d 942]; *People* v. *Campbell* (1976) 63 Cal.App. 3d 599, 608 [133 Cal.Rptr. 815]).

An examination of the record in this case and particularly proceedings held on April 21, 1981, on which date the judgment notwithstanding the verdict was granted by the court on its own motion, indicates that the trial judge was fully apprised of the legal requisites for the determination of mental competence to stand trial and for judicial action under Code of Civil Procedure section 629.

In the hearing of April 21, 1981, the judge reviewed the entirety of the case to that point, including the evidence adduced at the competency jury trial, the law applicable thereto, and the law relating to his intended action, setting aside the jury verdict.[1]

It is also clear from a review of the record that the trial judge was of the view that the evidence presented to the jury either established, or did not rebut the presumption, that appellant *did* understand the nature of the proceedings, and his status in reference thereto. However, the court's action in entering a judgment notwithstanding the verdict was based on his determination that there was no substantial evidence that

---

[1]"As I have said, I have carefully reviewed my trial notes. I have carefully reviewed my memory of the evidence that was presented. I have refreshed my memory to some extent by rereading the psychiatric reports by Drs. Coodley and Lieberman.

"I have a clear recollection of their testimony and I also have a clear recollection of the defendant's testimony. It is my determination that disregarding all conflicting evidence and considering the verdict of the jury as presumptively correct—and as I have said disregarding all the evidence that is conflicting and resolving all conflicts in favor of mental competency and indulging every inference in favor of competency—there is no evidence of a substantial nature to support the verdict. I am convinced that had a motion for a directed verdict of incompetency been made, such a verdict should have been directed and that should have been the determination.

"I think that the jury was completely wrong in its determination based upon the evidence that it heard. I am not basing this particular determination, based upon my own feelings as to the defendant's competency, but based upon the essentially uncontradicted and unconflicting evidence that was presented.

"As I have indicated, to the extent that there are any conflicts, I have resolved them in favor of competency. There is still no substantial evidence to support the jury's verdict. Accordingly, at *this time judgment notwithstanding, verdict will be entered that* the defendant is mentally incompetent."

appellant was capable of assisting counsel in conducting his defense, or was able to conduct his own defense, in a rational manner.[2]

A careful reading of the record in the case at bench causes us to agree with the trial judge.

Both expert witnesses, Alfred Coodley, M.D., and Alex Lieberman, M.D., concurred in the percipient conclusion that appellant was psychotic and that because of his condition, would be unable to cooperate with counsel or conduct his own defense in a rational manner.

Dr. Coodley, a psychiatrist with 36 years of experience, interviewed appellant on January 29, 1981. In preparation for the consultation, Dr. Coodley read an extensive arrest report and the transcript of the preliminary examination. Appellant was not cooperative with Dr. Coodley, and behaved in a suspicious and aggressive manner. Dr. Coodley was of the opinion that appellant was suffering from a paranoid schizophrenic illness of many years' duration. Dr. Coodley had the impression that appellant was not able to function on a normal, realistic level, but was operating on a psychotic basis as part of his paranoid schizophrenic illness. Dr. Coodley took into account appellant's psychiatric history which included a brief hospitalization in a psychiatric unit at Camarillo State Hospital some years before and the fact that appellant was to be admitted to the University of California at Los Angeles Neuropsychiatric Institute two years previously, but refused admission at the time it was to be accomplished. Prior to his testimony, Dr. Coodley had a conversation with appellant's former wife, who was the subject of the felonious assault charge (Pen. Code, § 217), set forth in count II of the information on file in the case at bench, relating to appellant's mental condition at that time.

---

[2]"THE COURT: In this case, I think that the evidence presented to the jury did clearly establish and certainly a fortiori it didn't rebut the presumption that the defendant could understand the nature of the criminal proceedings. That is only half of the test. The other half of the test is whether or not the defendant can assist counsel in the conduct of the defense. Or if he is representing himself, whether he can conduct his own defense in a rational manner. It would be presumed that the defendant could do so. It is the burden of whatever party is disputing the competency to go forward and to establish by a preponderance of the evidence that the defendant could not assist counsel or could not represent himself in the conduct of the defense in a rational manner.

"The evidence presented to the jury was overwhelming and I think the jury—whatever the reason was, either misunderstood the instructions or simply erred. I think the finding is clearly against the overwhelming weight of the evidence."

Dr. Lieberman, who has practiced psychiatry for 13 years, interviewed appellant on February 5, 1981. Dr. Lieberman's opinion was based entirely upon his interview, his reading of jail medical records relating to the appellant, and his observation of appellant as a witness in the competency proceeding. Appellant's conduct during the interview was described as being ". . . peculiar, and inappropriate, and bizarre . . . ." Appellant avoided looking at Dr. Lieberman and turned 180 degrees away from him. Appellant's body was tense and rigid. His demeanor was one of suspicion, fear, and negative feeling. Dr. Lieberman characterized appellant's condition as a loss of touch with reality. Dr. Lieberman expressed the general view that as a result of appellant's psychiatric condition, his relationships, behavior and judgments would be adversely affected.

Appellant testified as a rebuttal witness, on his own behalf, following the testimony of Dr. Coodley, and the initial testimony of Dr. Lieberman in connection with the People's case-in-chief. Appellant's testimony on direct examination was lucid with respect to the nature and stage of the criminal and competency proceedings. Appellant was aware that his position in the competency hearing was unique in that he was urging his competency to stand trial rather than the reverse, which is the more typical case. He explained his unwillingness to be interviewed by Drs. Coodley and Lieberman as being related to his effort to be a "good lawyer," as he was representing himself in propria persona.

On cross-examination, however, appellant made reference to the alleged conspiracy of his former wife and mother-in-law (the victims in the case at bench), and ". . . government officials of communist countries" to murder him. There ensued a colloquy between the appellant and the prosecutor relating to appellant's wearing of a bra and other female attire, and to the relationship of such usage to Sioux Indian customs as seen by appellant in the motion picture "A Man Called Horse."[3]

---

[3]"Q. Mr. Conrad, calling your attention to the wearing of the bra and the female attire; do you recall that? [¶] A. Yes—

"MR. SALTER: Your Honor, again, we are getting into that aspect of the incident, Your Honor, and again, I would object.

"THE COURT: Well, I will overrule the objection. That does, at least to some individuals, connote a rather bizarre behavior. Perhaps not to others, but I think it may go to his competency. He did, even though I realize it was somewhat over your desires, interject some explanation as to that. I will overrule the objection as to that matter.

"BY MR. WILSON: Q. Do you recall the incident that you wore female attire? [¶] A. Yes.

Following the testimony of appellant, Dr. Lieberman was recalled by the prosecution, as part of its case-in-chief. Based upon the testimony of appellant, Dr. Lieberman acknowledged that appellant realized the na-

"Q. Was there any particular reason that you did that? [¶] A. Yes.

"MR. SALTER: I offer an objection to this whole line of questions on the grounds previously stated—

"THE COURT: A continuing objection is deemed noted, and may be, as to each question. The ruling, however, is the same. It's overruled.

"BY MR. WILSON: Q. Would you like to tell us why you did that? [¶] A. Many people in contemporary America do that.

"Q. Do you have friends who do that, sir? [¶] A. No, I don't.

"Q. Do you know anybody, personally, that does that? [¶] A. A lot of people in jail do that.

"Q. Wear bras? [¶] A. Yes.

"Q. Are those among the male inmates? [¶] A. Yes.

"A. Why did you find it necessary to do that? [¶] A. It's considered moral and legal in contemporary America.

"Q. Are there any other Indian customs, that you know of, that you were following? [¶] A. Following?

"MR. SALTER: Objection, Your Honor—

"BY MR. WILSON: Q. Yes, any other— [¶] A. Sioux Initiation of the Bear.

"THE COURT: Just a minute. Let's hear the objection of Mr. Salter. [¶] Yes, sir.

"MR. SALTER: Again, I think it's another aspect of the underlying charge, Your Honor, and again, I would object.

"THE COURT: Well, I don't see where this material, which does deal with items where there has been previous information from a psychiatrist, does go to the underlying charges. I will overrule the objection.

"BY MR. WILSON: Q. Sir, what was the name of that Indian tribe? [¶] A. Sioux Initiation of the Bear.

"Q. Are you a Sioux Indian, sir? [¶] A. No.

"Q. Have you been initiated in that program? [¶] A. No, but I saw the movie, 'A Man Called Horse.'

"Q. I see. How long ago was that? [¶] A. A few years ago.

"Q. More than two or three? [¶] A. Probably.

"Q. Since that time, you have taken to wearing a bra on occasions? [¶] A. Yes.

"Q. Is that a matter of regular routine or just on special occasions? [¶] A. It varies.

"Q. Most recently, how would you classify it, routine or— [¶] A. It was routine. Before I went to jail, I had been doing that for about half a year.

"Q. How would you acquire these bras? [¶] A. I would buy them at the store.

"Q. Any particular store? [¶] A. Cheap, five and ten stores.

"Q. How many bras do you own, sir? [¶] A. Well, Marina Skarlovnik Conrad has all my property, and it's unavailable to me.

"Q. Before she came into possession of your bras, how many did you own? [¶] A. Several.

"Q. More than ten? [¶] A. No, less than ten, I would say.

"Q. Less than ten? [¶] A. All right. I will estimate, if you want an exact number. Right before the incident that caused me to be put in jail, I had approximately five of them. [¶] And about the Indian custom—

"MR. SALTER: Your Honor, I will object to any further—

"THE COURT: There is no question pending.

"THE WITNESS: Many American Indians have large breasts, and most white people do not know, but Indians do concern themselves with that kind of thing.

ture of the proceedings against him, but noted that appellant had a distorted sense of reality, and suffered from delusional grandiosity. He was of the opinion that appellant was "... far gone ... and would be exposed to an active psychotic break right here under pressure .... And I definitely think that Mr. Conrad, in his present condition, needs treatment very badly before the trial goes on."

Having read the record in this matter within the context of the guidelines laid down by the Supreme Court in *Henrioulle* v. *Marin Ventures, Inc., supra*, 20 Cal.3d 512, we affirm the judgment of the trial court that appellant was not mentally competent to stand trial, notwithstanding the verdict of the jury to the contrary.

The judgment is affirmed.

Spencer, P. J., and Lillie, J., concurred.

---

"THE COURT: I think it might be more helpful if you would wait until there is a question asked, Mr. Conrad. [¶] Okay. Next question.

"BY MR. WILSON: Q. Sir, do you have any particular feeling about the size of your own breasts, that requires you to wear a bra? [¶] A. Oh, what do you mean?

"Q. I mean, are you wearing a bra or have you worn a bra because you feel that your breasts are large in relation to others? [¶] A. Well, I described the phenomenon in relationship to contemporary American custom from a moral and legal standpoint as well as traditional standpoint. [¶] May I object to the Court as to further—

"THE COURT: I won't require you to answer the question, sir. If you want to stand by your prior answer, you can.

"MR. WILSON: I have no further questions."