[No. E052317. Fourth Dist., Div. Two. Nov. 10, 2011.]

LEWIS OPERATING CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
JOHN COSTAHAUDE, Real Party in Interest.

COUNSEL

LaMontagne & Terhar, Michael J. Terhar and Eric A. Amador for Petitioners.

No appearance for Respondent.

Law Offices of Brad Husen and Brad J. Husen for Real Party in Interest.

OPINION

**MILLER, J.—**

## INTRODUCTION

In this case, we are asked to determine whether a landlord who rents an apartment for residential use may enforce against the tenant an agreement to waive liability for the landlord's negligence. In general, as we will explain, the answer would clearly be "no." However, where the waiver in question relates to the landlord's operation of a tenant-only health club or exercise facility, we conclude that the waiver violates no statute or public policy. Accordingly, the waiver is enforceable and bars real party in interest's suit.

## STATEMENT OF FACTS

The action is one for personal injuries suffered by plaintiff and real party in interest John Costahaude (Costahaude) while using a treadmill at a health club or exercise facility operated by defendants and petitioners Lewis Operating Corporation and Homecoming II at Eastvale, LLC. The facility was offered as an "amenity" related to real party in interest's tenancy.[1] A person identified as an agent or employee of defendant and petitioner Brickhouse Training LLC rolled a ball into, or under, the treadmill, causing the treadmill to flip upward and throw real party in interest off the machine.

The case comes to us after the trial court denied a motion for summary judgment made by petitioners. The motion was based upon provisions in the rental agreement which, in section 29 of the agreement, purported to govern the "Use of Health and Recreation Facilities." By executing the agreement, Costahaude agreed that he "assumes all risk of harm resulting from the use of

---

[1] Lewis Operating Corporation and Homecoming II at Eastvale, LLC, are entities covered by the inclusive "Landlord Group" referenced in the rental agreement.

said facilities . . . and waives all Claims against the Landlord Group arising from or relating to the use of said facilities or the participation in such activities and programs by RESIDENT and his or her guests, even if caused by the Landlord Group's negligence or gross negligence. The use of said facilities shall be at the sole risk of RESIDENT and his or her guests."[2]

Responding to the motion, Costahaude asserted that the " 'release and waiver' " was void as being "against public policy." He did not challenge or elaborate upon the basic facts and circumstances of the accident as presented by petitioners. The trial court agreed with Costahaude's legal arguments and denied petitioners' motion for summary judgment. Petitioners seek review by way of a petition for writ of mandate, as authorized by Code of Civil Procedure section 437c, subdivision (m)(1).

## DISCUSSION

■ Real party in interest relied on Civil Code section 1953, subdivision (a)(5), which provides that "(a) Any provision of a lease or rental agreement of a dwelling by which the lessee agrees to modify or waive any of the following rights shall be void as contrary to public policy: [¶] . . . [¶] (5) His right to have the landlord exercise a duty of care to prevent personal injury or personal property damage where that duty is imposed by law." Enacted in 1975 and applying to all leases and rental agreements executed on or after January 1, 1976, the statute turned out to precisely reflect the views of the Supreme Court as expressed in *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512 [143 Cal.Rptr. 247, 573 P.2d 465] (*Henrioulle*), which involved an attempt to include a waiver or release in a pre-1976 residential lease. Relying upon its earlier decision in *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*), the court reiterated the rule that "exculpatory clauses affecting the public interest are invalid," and that a residential lease *did* affect the public interest. (*Henrioulle*, at pp. 517, 519.)

Thus, Civil Code section 1953 was essentially a codification of California common law, and its application in general to residential leases is beyond dispute. The issue here is whether public policy prohibits exculpatory clauses in a residential lease that pertain to what might be called *noncore functions* of the property.

---

[2] The attempt to cover *gross* negligence may well be invalid (see· *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 777 [62 Cal.Rptr.3d 527, 161 P.3d 1095]), but there is apparently no allegation of such negligence, and the facts before us would not support such a claim. We do not decide this issue.

■ We are not persuaded by petitioners' first argument to the effect that Civil Code section 1953 only prohibits waivers of *statutory* duties such as those set out in Civil Code sections 1941 and 1941.1 relating to habitability.[3] Duties are also imposed judicially, by the common law, and such duties are enforceable in the same manner as statutory duties. (See *Moss v. Superior Court* (1998) 17 Cal.4th 396, 410 [71 Cal.Rptr.2d 215, 950 P.2d 59].) Thus, we have grave doubts that a landlord would be able to enforce an exculpatory clause just because the tenant's injury was caused by a defect *other* than one comprised in the concept of *habitability*. It is well established that a landlord must comply with the general obligation of Civil Code section 1714, which requires every person to take "reasonable care" in the management of his or her own property. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674, 679–680 [25 Cal.Rptr.2d 137, 863 P.2d 207]; see also *Rowland v. Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561].) Thus, a landlord may be liable to a tenant for injuries incurred due to dangers or defective conditions that have nothing to do with *habitability* or *tenantability* in the legal sense. For example, a landlord may be liable if a child falls out of a window in a common hallway (*Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 898 [87 Cal.Rptr.2d 34]), fails to install a perimeter barrier when it is foreseeable that playing children might be propelled into a busy street (*Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1479–1480 [84 Cal.Rptr.2d 634]), or fails to provide safety warnings and equipment at a common area swimming pool (*Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 763 [91 Cal.Rptr. 745, 478 P.2d 465]).

As the above mentioned cases show, a landlord may be held liable in tort under usual rules of duty and negligence even if the dangerous condition does not exist in the tenant's dwelling and does not affect the statutorily required element of *habitability* or *tenantability*. We will assume, arguendo, that a landlord may not lawfully require the tenant to sign an exculpatory clause relating to injuries that might occur as a result of the tenant's use of the basic or essential common areas—i.e., a parking area, lawns, walkways or corridors. However, we do conclude that a landlord's duty to maintain *amenities*

---

[3] Civil Code section 1941 imposes upon the lessor of property *for human occupation* the obligation to make it "fit for such occupation" and to repair "subsequent delapidations," which "render it untenantable." Civil Code section 1941.1 specifies conditions the absence of which renders a dwelling "untenantable." The requirements include effective waterproofing, adequate plumbing and gas facilities, properly installed and functional electrical lighting, heating facilities "in good working order," and "[b]uilding, grounds, and appurtenances at the time of the commencement of the lease or rental agreement, and all areas under control of the landlord, kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin." (*Id.*, subds. (a)–(f).) It also requires that "[f]loors, stairways, and railings [should be] maintained in good repair." (*Id.*, subd. (h).)

does not necessarily trigger the application of Civil Code section 1953 or the rule of *Henrioulle* and *Tunkl* and, in fact, does not do so in this case.

We need not decide how far our decision reaches because, in this case, the provision of an onsite health club or exercise facility was clearly well outside the basic, heavily regulated offering of a residential dwelling. Furthermore, providing health club or exercise facility services has repeatedly been held *not* to invoke the "public policy" rule of *Tunkl*, and this strongly suggests that the same result should be obtained even if the operator of the health club or exercise facility is also the user's landlord.

■ In *Tunkl*, the court began by acknowledging that the law recognizes the concept of *freedom of contract* and allows the parties to contract substantial latitude in fixing their rights and responsibilities even in a manner contrary to statute. (*Tunkl, supra,* 60 Cal.2d at pp. 96–98; see also *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1548 [46 Cal.Rptr.2d 33] [modifying statute of limitations]; *Regional Steel Corp. v. Superior Court* (1994) 25 Cal.App.4th 525, 528–529 [32 Cal.Rptr.2d 417] [indemnification agreement].) However, the court set limits to this freedom by holding that "the exculpatory clause which affects the public interest cannot stand . . . ." (*Tunkl,* at p. 98.) It then proceeded to elaborate on when the "public interest" would prevail over the parties' freedom to contract as they chose. Recognizing that it could provide only a "rough outline of that type of transaction in which exculpatory provisions will be held invalid,"[4] it indicated that the subject transaction would be of "a type generally thought suitable for public regulation." (*Tunkl,* at p. 98.) "The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person

---

[4] Although exculpatory provisions are a primary target for invalidation on "public policy" grounds, the law also limits the parties' freedom to contract in numerous other ways. (See, e.g., Civ. Code, §§ 2782 [limitation on indemnification and risk shifting in construction contracts], 1995.250 [restrictions on landlord's power to refuse consent to the tenant's transfer of interest], 3262 [restrictions on waivers or releases of mechanics' liens].)

or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id.* at pp. 99–101, fns. omitted.)

The plaintiff in *Tunkl* was a hospital patient who had been required to sign an exculpatory clause in the hospital's favor before being admitted. The court held the contract to be contrary to public policy under the standards set forth in that opinion. (*Tunkl, supra,* 60 Cal.2d at pp. 97–98, 102, 104.) As we have noted, in *Henrioulle,* the Supreme Court went on to determine that the offering and obtaining of residential rental property similarly impacted a strong public interest so that exculpatory clauses in such contracts were invalid. (*Henrioulle, supra,* 20 Cal.3d at pp. 520–521.)

■ Later cases have applied these authorities to invalidate exculpatory clauses in a variety of contexts found to implicate "public policy." (See *Neubauer v. Goldfarb* (2003) 108 Cal.App.4th 47, 57 [133 Cal.Rptr.2d 218] [majority shareholders' fiduciary duty]; see also *Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662 [131 Cal.Rptr.2d 168] [childcare]; *Baker Pacific Corp. v. Suttles* (1990) 220 Cal.App.3d 1148 [269 Cal.Rptr. 709] [employees' advance waiver of employer's liability for asbestos injury].) However, the law has also been consistent in *enforcing* exculpatory clauses, releases, and waivers in the *recreational* context. As one court recently stated in no uncertain terms, "[r]ecreational activities such as snow skiing or parachute jumping are not essential services or necessities affecting the public within the meaning of *Tunkl.*" (*Booth v. Santa Barbara Biplane Tours, LLC* (2008) 158 Cal.App.4th 1173, 1179 [70 Cal.Rptr.3d 660].)[5] This principle is by now too well established to need further citation of authority, although the *Booth* court collected a number of cases in various recreational contexts. We will also note *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351 [129 Cal.Rptr.2d 197], which specifically applied the rule in the health club context.

■ This brings us back to our case, representing the interplay between a clear matter of essential public interest (residential tenancies) and a nonessential matter of personal improvement or enjoyment (the use of exercise

---

[5] The broad application of this rule to *recreational activities* must be distinguished from any tendency to construe exculpatory clauses or releases strictly against the provider of the recreational services. (See *Huverserian v. Catalina Scuba Luv, Inc.* (2010) 184 Cal.App.4th 1462 [110 Cal.Rptr.3d 112]; see also *Cohen v. Five Brooks Stables* (2008) 159 Cal.App.4th 1476 [72 Cal.Rptr.3d 471].) Construing an exculpatory clause strictly against the party who prepared it involves different rules from the question of whether an exculpatory clause, as written and construed, is legally enforceable.

facilities). We conclude that where a landlord chooses to enhance its offering by providing an onsite health club or exercise facility that goes well beyond bare habitability, there is no reason why the landlord may not protect itself by requiring the tenant, as a condition of use of the amenity, to execute the same waiver or release of liability that could lawfully be required by the operator of a separate, stand-alone health club or exercise facility.[6]

■ Civil Code section 1953 is designed to protect a tenant's basic, essential need for shelter. Real party in interest's recreational use of the fitness facility and equipment was in no way critical to this need. Petitioners had no legal obligation to offer such a facility and we conclude that it was entitled to condition real party in interest's use on his execution of the waiver and release at issue here. No public policy was violated by the exculpatory clause, and it may be enforced against real party in interest in this case.

### DISPOSITION

The petition for writ of mandate is granted. Let a peremptory writ of mandate issue, directing the Superior Court of Riverside County to vacate its order denying petitioners' motion for summary judgment and to enter a new order granting said motion.

Petitioners are directed to prepare and have the peremptory writ of mandate issued, copies served, and the original filed with the clerk of this court, together with proof of service on all parties.

Petitioners to recover their costs.

Hollenhorst, Acting P. J., concurred.

**KING, J.,** Dissenting.—I respectfully dissent.

I would conclude based on the plain language of Civil Code section 1953, subdivision (a)(5) that the "release and waiver" provision of section 29 of the

---

[6] Because this case involves an injury that occurred while real party in interest was actually using the exercise equipment, we have no cause to determine whether petitioners might be liable for a dangerous condition of the premises used to access the health club or otherwise how far the release might reach.

residential lease is "void as contrary to public policy." The statute states: "(a) *Any* provision of a lease or rental agreement of a dwelling by which the lessee agrees to modify or waive any of the following rights shall be void as contrary to public policy: [¶] . . . [¶] (5) His right to have the landlord exercise a duty of care to prevent personal injury or personal property damage where that duty is imposed by law." (Civ. Code, § 1953, subd. (a)(5), italics added.)

"Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them 'their usual and ordinary meaning.' [Citation.] 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.]" (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387–388 [97 Cal.Rptr.3d 464, 212 P.3d 736].) " 'In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. . . .' " (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) By contrast, "[i]f the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)

The language of the statute is clear and there is no uncertainty concerning the Legislature's intent. It is evident from the plain language of the statute that the Legislature intended to declare and did declare as "void as contrary to public policy" *any* provision in a residential lease by which the lessee agrees to waive his right to have the landlord exercise a duty of care to prevent personal injury or property damage to the tenant, where the landlord's duty is imposed by law. (Civ. Code, § 1953, subd. (a)(5).) And, as the majority acknowledges, a landlord has a "duty imposed by law" to exercise reasonable care in managing its properties to prevent personal injuries or property damage to its tenants. (Civ. Code, § 1714; *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 499 [229 Cal.Rptr. 456, 723 P.2d 573] [landlords have "a duty to exercise due care for the residents' safety in those areas under their control"].) Nothing in the statute supports the notion that the Legislature intended to exempt from the scope of the statute a landlord's duty to exercise reasonable care in maintaining "amenities," such as workout facilities or other "noncore functions," for its tenants.

After acknowledging that a landlord owes a duty of care to its tenants, the majority states: "However, we do conclude that a landlord's duty to maintain *amenities* does not necessarily trigger the application of Civil Code section 1953 or the rule of *Henrioulle* and *Tunkl*[1] and, in fact, does not do so in this case." (Maj. opn., *ante*, at pp. 945–946.) In reaching this conclusion, the majority reads into the statute an exemption for a landlord's maintenance of "amenities" or other "noncore functions" that is simply not present in the language of the statute. This violates the basic tenet of statutory construction. "In construing this, or any, statute, our office is simply to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does. We may not rewrite the statute to conform to an assumed intention that does not appear in its language." (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 [85 Cal.Rptr.3d 466, 195 P.3d 1049].)

The majority also identifies the issue as whether *public policy* prohibits exculpatory clauses for amenities or noncore functions in residential leases. This is not the issue. The issue is whether the *statute* prohibits such exculpatory clauses in residential leases. Public policy has nothing to do with the construction of a statute when the statute is clear on its face. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra*, 34 Cal.4th at p. 737 [the court looks to public policy only when the statute is subject to more than one reasonable interpretation].) And to the extent we are concerned with public policy, "aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71–72 [78 Cal.Rptr.2d 16, 960 P.2d 1046] [administrative regulations may be the source of public policy where statutorily authorized regulations are " 'tethered to' statutory provisions"].) Civil Code section 1953 plainly sets forth the public policy of this state, and that policy is that any clause in a residential lease which purports to relieve a landlord of its legal duty to exercise reasonable care to prevent personal injury or property damage to its tenants is void. It is not for the court to make its own exception based on its notion of what the policy should be. "When the Legislature has spoken, the court is not free to substitute its judgment as to the better policy." (*City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 121 [48 Cal.Rptr.2d 42, 906 P.2d 1196].) When the legislative intent is clear from the plain meaning of the words we are to follow it, " ' " 'whatever [we] may [think] of the wisdom,

---

[1] *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512 [143 Cal.Rptr. 247, 573 P.2d 465]; *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441].

expediency, or policy of the act.' " ' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

Furthermore, the majority, in discussing its interpretation of the legislative intent underlying the statute, states: "Civil Code section 1953 is designed to protect a tenant's basic, essential need for shelter." (Maj. opn., *ante*, at p. 948.) And at another point, the majority indicates, "[w]e conclude that where a landlord chooses to enhance its offering by providing an onsite health club or exercise facility that goes well beyond bare habitability" (maj. opn., *ante*, at p. 948), the landlord should be able to exculpate itself from liability by way of a release and waiver provision.

It is clear that the Legislature did not have this in mind when it enacted Civil Code section 1953 in 1975. As acknowledged in the enrolled bill memorandum dated August 19, 1975, already in force at time of the passage of Senate Bill No. 314 (1975–1976 Reg. Sess.), was Civil Code section 1942.1, which provides that any waiver of rights by a lessee dealing with habitability was void as a matter of public policy. Thus, if the Legislature merely intended to protect the "essential need for shelter," or "bare habitability" there would have been no need for Civil Code section 1953. Instead, it is evident the Legislature intended Civil Code section 1953 to have a more expansive applicability. As stated in the enrolled bill memorandum: "In view of the superior position of the landlord in most residential leases and rental agreements, statutes prohibiting . . . the waiver of the landlord's liability for negligence are long overdue." (Cal. Dept. of Real Estate, Enrolled Bill Rep. on Sen. Bill No. 314 (1975–1976 Reg. Sess.) Aug. 19, 1975, p. 4.) "The bill would help prevent the unknowing signing away of valuable rights by a tenant who may not fully understand a lease or rental agreement." (Cal. Dept. of Housing and Community Development, Enrolled Bill Rep. on Sen. Bill No. 314, *supra*, Aug. 19, 1975, p. 1.)

Lastly, the majority concludes that the use of an exercise facility is a nonessential matter of personal enjoyment and that a landlord, "where [he or she] chooses to enhance its offering by providing an onsite health club" (maj. opn., *ante*, at p. 948), should be able to avail itself of the same waiver or release of liability as a stand-alone health facility. While the offering of an onsite health club may at the present time be considered an "enhancement," its offering is nonetheless market driven, and is something that the landlord has chosen to provide as part of the leased premises. It is not separate and

apart from the leasehold.[2] To read out of the statute so-called "amenities" or "enhancements," be they recreationally oriented or not, creates an exception to the statute not authorized by or enacted by the Legislature.

---

[2] Just as garbage disposals, dishwashers, or laundry facilities may have been viewed as "amenities" or "enhancements" in the 1970's, or in earlier times, currently these features are more likely to be considered standard offerings.