[No. C004530. Third Dist. Apr. 17, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL B. SKEIRIK, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and III.

COUNSEL

Fern M. Laetham, State Public Defender, under appointment by the Court of Appeal, Paul M. Gerowity and Allison Pease, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, W. Scott Thorpe and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### DAVIS, J.—

#### INTRODUCTION

After he was found competent to stand trial, defendant Michael B. Skeirik was convicted of two counts of assault with a deadly weapon and one count of possession of a firearm by an ex-felon. The jury found true various special allegations, including a habitual offender allegation under Penal Code section 667.7[2] and two allegations of prior serious felonies under section 667, subdivision (a), based on a 1966 robbery conviction and a 1982 conviction for assault with a deadly weapon. He was sentenced to two consecutive indeterminate life terms concurrent with a determinate sentence of eighteen years four months.

On appeal, defendant argues that his convictions should be reversed because (1) the trial court erroneously relieved his counsel prior to the hearing to determine his competency to stand trial; (2) his right to due process was violated by allocating to him the burden of proving his incompetence to stand trial; and (3) the trial court erred in refusing to accept his plea of not guilty by reason of insanity by failing to determine that good cause did not exist for his delay in asserting the plea. Defendant also raises various challenges to his sentence.

In the published portion of the opinion we find no sentencing error in imposing multiple life terms under section 667.7, but do find that the court erred in imposing a determinate sentence on counts II and III, and 10 years for the 2 prior serious felony conviction enhancements. Out of concern that trial judges may mistakenly use the language of CALJIC No. 4.10 (1984 rev.) to instruct the jury in all hearings to determine the competency of a defendant to stand trial, we will also publish that portion of the opinion rejecting defendant's due process attack on the presumption of competence codified in section 1369, subdivision (f).

In the unpublished portion of the opinion we find the trial court did not improperly reject, the day before trial, a plea of not guilty by reason of insanity. We also find no prejudicial error in the appointment of new counsel to represent defendant at the hearing to determine his competence to stand trial.

Accordingly, the determinate sentences on the assault charges and the two 5-year enhancements are stricken. In all other respects, the judgment is affirmed.

---

[2] Unless otherwise indicated, all undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of December 30, 1986, a man later identified as defendant Michael Skeirik forced his way into the apartment of Ron Beck by pointing a gun at him. Defendant repeatedly asked Beck where Gerald Rose was and Beck insisted that he did not know. Defendant threatened to blow Beck's head off. He then aimed the gun at the head of Beck's girlfriend, Rikki, and made the same threat. Beck insisted that he did not know where Rose was.

Defendant sat down on the sofa and called Mike Edwards into the apartment. Defendant fired a shot in Beck's direction. He then put his arms around Beck's neck, with the gun under his chin. The gun went off. Beck was shot through the right side of his neck. Defendant and Edwards left the apartment.

A neighbor observed a white pickup carrying two men backing up and driving off in a hurry.

Later that evening defendant approached Robert Turner and Pete Lorenz and asked them if they were police officers. After they responded no, defendant told them he had a .357 magnum and shot at them. Turner got into his car and made a U-turn to see defendant's vehicle clearly. He called the police.

Defendant was apprehended that evening driving a Chevy van and armed with a .357 magnum in a shoulder holster.

By second amended information, defendant was charged with one count of attempted murder in violation of sections 664/187 (Ron Beck) (count I); two counts of assault with a deadly weapon by force likely to cause great bodily injury in violation of section 245, subdivision (a) (Ron Beck; Robert Turner and Peter Lorenz) (counts II-III); and one count of possession of a firearm by an ex-felon or addict in violation of section 12021, based on a 1966 robbery conviction (§ 211) and a 1982 conviction for assault with a deadly weapon/use of firearm (§§ 245, subd. (a) and 12022.5) (count IV).

A special allegation of use of a firearm in the commission or attempted commission of a felony in violation of section 12022.5 was charged as to counts I, II and III. A special allegation of great bodily injury in violation of section 12022.7 was charged as to counts I and II. Defendant was charged with a special allegation of habitual offender in violation of section

667.7 and two special allegations of prior "serious" felonies in violation of section 667, subdivision (a), based on these same convictions.[3]

Defendant entered a plea of not guilty and denied the special allegations.

A day before trial was scheduled to begin and approximately one month after Attorney Russell Swartz was appointed to represent him,[4] defendant complained that Swartz had not seen him in jail since his appointment. Defendant requested appointment of other counsel. An in camera *Marsden* hearing (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) was held. Prior to the *Marsden* hearing, Swartz indicated that defendant may want to enter a plea of not guilty by reason of insanity to the second amended information.

After the *Marsden* hearing, the court denied the motion and indicated that defendant's plea was not guilty.

Trial began on November 10, 1987. The court denied defendant's request that he be granted cocounsel status with Swartz.

### Competency Proceedings

#### Suggestion of Doubt

On November 12, 1987, Swartz indicated his willingness to accept the jury. He also indicated defendant's disagreement with this tactical decision based on his desire to challenge the jury for age, race and anticrime bias of the elderly.

Swartz informed the court that he questioned defendant's ability to rationally assist counsel in the conduct of his defense under sections 1367-1368. Swartz indicated that in February defendant had met with Dr. French, a psychiatrist, regarding his mental competence and that Dr. French had concluded that defendant was competent and that a section 1368 procedure was not appropriate. Dr. French indicated that defendant should consider a not guilty by reason of insanity defense. According to Swartz, defendant advised Dr. French and his previous attorneys that he did not wish to enter a plea of not guilty by reason of insanity. Defendant

---

[3] At trial, an amendment was granted to allege section 245, subdivision (a)(2) and the allegations of "with a deadly weapon" and "and with means of force likely to produce great bodily injury" were stricken as to counts II and III.

[4] Defendant's first attorney was relieved due to conflict. He was replaced by attorney Hurley who was relieved on September 25, 1987. On Monday, September 28, 1987, defendant was granted a continuance to September 30 to allow time to review proceedings with new counsel. On September 30, Swartz accepted appointment.

now wanted to enter such a plea. Swartz stated that defendant would begin rationally then slip into eccentric behavior from which he could not recover. Swartz requested a mental examination under section 1368.

Defendant told the court that he disagreed with Swartz's focus on a negotiated plea, which defendant felt was excessive in light of his mental state at the time of the episode. Defendant agreed with the court that the competence hearing should be conducted because his mental state at the time of the event was extremely bad.

The court suspended the proceedings under section 1368 and appointed Dr. Wilson to evaluate defendant and report to the court the next day.

On November 13, 1987, a hearing was held during which Wilson testified that, although defendant clearly understood the nature of the proceedings, he was not competent to cooperate with counsel in a rational manner or to rationally assist counsel at trial. His opinion was based on an examination of defendant of two and three-fourth hours' duration. There was a suggestion of organic affective brain syndrome from a motorcycle accident. Within a conversation, defendant would exhibit short-term rationality but long-term irrationality.[5] Wilson concluded that defendant was unable to rationally assist his counsel or to take part in the proceedings of a jury trial.

After hearing Wilson's testimony, defendant informed the court that he believed himself to be able to both participate in his trial and to defend himself at the competency trial. He requested a jury trial on competence. The court ordered further proceedings under sections 1367 and 1368 and discharged the jury.

*Relieving Counsel Prior to 1368 Hearing*

At this point, the court stated "[I]t will be necessary in the Court's view to appoint counsel for defendant for his trial under [section] 1368." The court gave no reason for the substitution; however, according to Swartz, he was removed because "[b]asically, I thought the 1368 section applied and

---

[5] In his written report, Wilson noted that defendant claimed no memory of the episode leading to the charges. Wilson indicated that defendant had difficulty in focusing and that test results suggested organic brain syndrome, possibly associated with a traumatic head injury from a motorcycle accident. A possible psychotic disorder was indicated. Wilson concluded that defendant understood the charges against him, was aware of possible defenses and penalties to which he might be subject. He appeared to pass the "comprehension" prong of the legal test of competency. Wilson agreed with Swartz that meaningful communication was not possible regarding options available for his legal defense due to his inability to focus long enough to listen. Wilson concluded that defendant was not competent to stand trial due to his inability to use information in a rational way.

Mr. Skeirik doesn't." Swartz was to remain defense counsel on the suspended criminal proceedings.

Attorney Suter, who was the next available counsel on the court's list of available attorneys, was appointed. At a subsequent hearing, the court noted that Suter intended to "withdraw" the request for section 1368 proceedings[6] and that the defense adopted the position that defendant was competent to stand trial. Suter informed the court of his personal opinion that defendant was capable of assisting in his defense. The district attorney also took the position that defendant was competent. The court concluded that, under section 1369, a second psychiatric or psychological opinion was necessary and he appointed Dr. Caruso.

*Jury Trial on Competency*

At the jury trial on competency, Suter stipulated to the previous testimony of Wilson and then took the part of defense counsel when the testimony was read to the jury. Included in this testimony was a cross-examination of Wilson by Swartz.

Caruso testified that there was no indication that defendant suffered from organic brain damage; that there was no sign of mental deficiency; that defendant was able to understand the nature of the proceedings and to rationally assist his counsel. His opinion was based on testing and an interview/examination of two and one-half hours' duration. He did not notice a deterioration in defendant as time progressed, but just the opposite—with time, defendant became a more effective communicator. Caruso noted that defendant was very upset and angry at the criminal process and the length of time he had been in jail. Although defendant "got off on that a little bit," there was no confusion or deviancy in his thinking patterns at those times and Caruso had no difficulty in refocusing him.

No other testimony was received. In closing, Suter asked the jury to weigh the opinions of both experts and to apply the facts to the law.

The jury was instructed that "defendant is presumed to be mentally competent and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent as a result of mental disorder [or developmental disability] . . . ."

The jury found defendant mentally competent to stand trial and criminal proceedings were resumed under section 1370.

---

[6]The court correctly noted that once the issue of competency is raised it is inappropriate for defendant to waive it.

*Resumption of Criminal Proceedings*

On January 6, 1988, the court granted defendant's motion for appointment of new counsel. Swartz was relieved and Suter was appointed to represent defendant at trial. On March 22, the court denied defendant's Marsden motion for substitution of counsel.

A bifurcated trial was held, first on counts I-III, then on count IV and the special allegations. Defendant was found guilty on counts II-IV. All special allegations were found true.

A mistrial was declared on count I and the charge was eventually dismissed upon the motion of the district attorney.

The court denied probation and sentenced defendant to a determinate sentence of eighteen years, four months in prison on two counts of assault with a deadly weapon, one count of felon in possession of a firearm, two enhancements under section 12022.5, and two enhancements under section 667, subdivision (a). The court also sentenced defendant to two consecutive life sentences pursuant to section 667.7, subdivision (a)(1), the habitual criminal statute.

I

RELIEVING COUNSEL PRIOR TO THE COMPETENCY HEARING*

. . . . . . . . . . . . . . . . . . . . . . . . .

II

BURDEN OF PROOF

At the hearing to determine whether defendant was incompetent to stand trial, the trial court used the jury instruction set forth in CALJIC No. 4.10 (1984 rev.) to instruct the jury that "[t]he defendant is presumed to be mentally competent, and he has the burden of proving by a preponderance of the evidence that he's mentally incompetent as a result of some mental disorder or developmental disability." After obtaining the finding of competency he desired, defendant now contends for the first time on appeal that the presumption of competence codified in section 1369, subdivision (f), denied him due process of law by irrationally allocating the burden of

---

*See footnote 1, *ante*, page 444.

proving incompetence to someone who may not have been able to assist his attorney prior to and during the hearing. We find that the trial court's allocation of the burden of proof to the defendant did not deny him due process of law.[10]

■ The conviction of an accused person while he is legally incompetent violates due process. (*Pate* v. *Robinson* (1966) 383 U.S. 375, 377 [15 L.Ed.2d 815, 817-818, 86 S.Ct. 836].) "Indeed, the United States Supreme Court has held that the failure of a trial court to employ procedures to protect against trial of an incompetent defendant deprives the defendant of his due process right to a fair trial . . . ." (*People* v. *Hale* [1988] 44 Cal.3d [531], 539 [244 Cal.Rptr. 114, 749 P.2d 769].)

■ Section 1367 provides in part: "A person cannot be tried or adjudged to punishment while such person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." The underlying theory is that an incompetent person is incapable of adequately defending himself against the charge. (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2987, p. 3666.)

■ "Although the competency hearing takes place as a result of, and during, a criminal trial, it is not a criminal action, for it does not involve a charge of crime nor result in a criminal punishment. It is a special proceeding, governed by the rules applicable to civil proceedings." (5 Witkin & Epstein, *op. cit. supra*, § 2989, at p. 3667, italics omitted; see *People* v. *Conrad* (1982) 132 Cal.App.3d 361, 368 [182 Cal.Rptr. 912], [affirming a judge's judgment notwithstanding the verdict pursuant to Code Civ. Proc., § 629].)

Section 1369 subdivision (f) provides: "In a jury trial, the court shall charge the jury, instructing them on all matters of law necessary for the rendering of a verdict. It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent. The verdict of the jury shall be unanimous."[11]

---

[10] In making his due process argument defendant makes a brief reference to equal protection. None of defendant's authorities involves or discusses equal protection concerns and he makes no separate argument regarding equal protection. We conclude from this that his argument is essentially a due process challenge to the statutory scheme.

[11] The presumption of competence set forth in Penal Code section 1367, subdivision (f), like the presumption of innocence codified in Penal Code section 1096 and the presumption

California defines rebuttable presumptions as those affecting the burden of producing evidence and those affecting burden of proof.[12] Evidence Code section 605 provides: "A presumption affecting the burden of proof is a presumption established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of marriage, the stability of titles to property, or the security of those who entrust themselves or their property to the administration of others." **(5)** The presumption of competence set forth in section 1369, subdivision (f), is such a presumption in that it is part of a comprehensive statutory scheme enacted in 1974 to address the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution, preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public. (Stats. 1974, ch. 1511.)[13]

---

of sanity codified in Evidence Code section 522 is not, strictly speaking, a presumption in the sense of an inference deduced from a given premise. It is more accurately an assumption which has for its purpose the recognition of a public policy. (See Evid. Code § 600; Cleary, McCormick On Evidence (3d ed. 1984) § 342, p. 967.)

[12] Evidence Code section 603 provides: "A presumption affecting the burden of producing evidence is a presumption established to implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied."

Evidence Code section 604 provides: " The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate."

[13] Until 1973, if an individual was found incompetent to stand trial he was committed to a state hospital or other treatment facility until he attained the capacity to stand trial. (Stats. 1968, ch. 599, p. 1270.) If he never attained the requisite competency, his commitment operated as a life sentence. It made no difference whether he was charged with murder or petty theft.

In 1973 the Supreme Court put an end to the then existing scheme for commitment of incompetent criminal defendants by holding in *In re Davis* (1973) 8 Cal.3d 798 [106 Cal.Rptr. 178, 505 P.2d 1018], that when there is no reasonable likelihood that a criminal defendant will regain competence to stand trial in the foreseeable future, he must either be released or subjected to commitment proceedings initiated pursuant to civil commitment laws as embodied in the Lanterman-Petris-Short Act (hereinafter referred to as the LPS Act.) (Welf. & Inst. Code, § 5000 et seq.)

At the time *Davis* was decided long-term involuntary commitment under the LPS Act was imposed only upon individuals categorized as "gravely disabled." (Stats. 1971, ch. 1593, § 366, p. 3335.) However, the LPS Act contained no specific provision for commitment of criminal defendants who were found incompetent to stand trial. While such defendants may have fit into the category of persons who are a danger to themselves or others so that short term commitments under the LPS Act were possible, they would not necessarily fit into the category of "gravely disabled" persons necessary for long-term commitment. Thus, if the

Evidence Code section 606 provides: "The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." Evidence Code section 502 provides in part: "The court *on all proper occasions* shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party . . . establish the existence or nonexistence of a fact by a preponderance of the evidence . . ." (Italics added.)[14]

When a doubt arises as to the defendant's mental competence to stand trial, the trial court has an independent responsibility to state that doubt on the record and, if necessary, recess the proceedings to permit defense counsel to form an opinion as to his client's competency to stand trial. (§ 1368, subd. (a).)[15] If defense counsel shares the court's doubt regarding the defendant's competence, a special hearing shall be held in the superior court to determine the question of competence. (§ 1368, subd. (b).)[16]

---

LPS Act were used to commit incompetent criminal defendants, the maximum period of commitment would typically be 90 days.

The Legislature responded by enacting a new commitment scheme which became effective in September 1974 as an urgency measure. (Stats. 1974, ch. 1511.) In so doing the Legislature addressed the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution, preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public. As a result of this effort, criminal defendants found incompetent to stand trial are now subject to an initial commitment for a definitely limited period not to exceed three years. Thereafter, any further commitment may occur only if the defendant falls within the new standards set forth in the LPS Act. (See Parker, *California's New Scheme for the Commitment of Individuals Found Incompetent to Stand Trial* (1975) 6 Pacific L.J. 484.)

[14] Evidence Code section 502 provides: "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt."

[15] Section 1368, subdivision (a), provides: "If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

[16] Section 1368, subdivision (b), provides: "If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to sections 1368.1 and 1369. If counsel informs the court that he believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court."

However, the statutory scheme recognizes that defendant, his counsel, and the prosecution may all believe that defendant is competent. Facing the prospect of up to three years of involuntary confinement without a final determination of guilt or innocence, defendant and his counsel often will not seek a finding of incompetency. By statute the court may in such circumstances nevertheless order a hearing on its own motion in order to assure that a mentally incompetent person is not being tried for a criminal offense. (§ 1368, subd. (b); see fn. 16, *ante*.)

Thereafter, if an information, indictment, or misdemeanor complaint survives a defendant's challenges as to its validity, a hearing is held on the question of mental competency to stand trial. (§§ 1368.1, 1369.) The defendant is entitled to have the issue of his competency tried by the court or a jury. (§ 1369.) The trial court must appoint a psychiatrist or licensed psychologist and other appropriate experts to examine the defendant. Expressly recognizing that neither the prosecution or defendant and his counsel may be seeking a finding of incompetence, section 1369, subdivision (a), provides in part that "[i]n any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof."[17]

Consistent with the imposition of pretrial requirements on the trial court to independently take steps to assure the competence of the defendant (§§ 1368, subds. (a) & (b), 1369, subd. (a); see fns. 15, 16, 17, *ante*), the statutory scheme recognizes that there may, as was the case here, be evidence supporting a finding of incompetence known to the court as a result of its appointment of mental health experts, yet neither the prosecution, defendant nor his counsel have any real interest in presenting it to the fact finder. Section 1369, subdivision (b)(2), provides that "[i]f the defense de-

---

[17]Section 1369, subdivision (a), provides: "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof. One of the psychiatrists or licensed psychologists may be named by the defense and one may be named by the prosecution. If it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code, or the designee of the director, to examine the defendant. The court may order the developmentally disabled defendant to be confined for examination in a residential facility or state hospital.

"The regional center director shall recommend to the court a suitable residential facility or state hospital. Prior to issuing an order pursuant to this section, the court shall consider the recommendation of the regional center director. While the person is confined pursuant to order of the court under this section, he or she shall be provided with necessary care and treatment."

clines to offer any evidence in support of the allegation of mental incompetence, the prosecution may do so." Section 1369, subdivision (d) provides that "[e]ach party may offer rebutting testimony, unless the court, for good reason in furtherance of justice, also permits other evidence in support of the original contention." (See also, *People* v. *Redmond* (1971) 16 Cal.App.3d 931, 939, fn. 7 [94 Cal.Rptr. 543] [explaining that there may be cases under former § 1368 hearings wherein the trial court is compelled to take the initiative in having proof on the issue of present sanity intro- ██ Here, faced with evidence in support of the original contention, the trial court, expressly relying on section 1389, subdivision (d), found good cause to present such evidence to the jury.

The trial court needed a procedure for presenting the evidence of incompetence to the jury, thereby assuring that the proscription against trying an incompetent criminal defendant was not violated. (§ 1367; see also *People* v. *Lawson* (1918) 178 Cal. 722, 725 [174 P. 885], [holding that California's statutory rules forbidding proceedings against one who is mentally deranged to such an extent as to be incapable of appreciating his situation and making any legal defense that he may have are an affirmation of common law rules].) Defendant and his counsel provided the trial court with such a procedure by choosing to present the only evidence of incompetency to the jury by stipulating to the reading of Wilson's prior testimony. Defense counsel then read the part of the defense attorney and thereafter chose not to argue against a finding of incompetence, but rather argued: "Your function today is to take the jury instructions as read to you by the judge, and apply the facts that you have heard here to it. And all you have to do is weigh the opinions of both experts, what Doctor Wilson's stated, and what Doctor Caruso stated. And just think in those terms, and just apply the facts to the law."

Through argument and through the stipulation and resulting reading of Dr. Wilson's testimony, defendant and his counsel presented the case for a finding of incompetency. The presumption of competency operated against that position. Using CALJIC No. 4.10 (1984 rev.), the trial court accordingly instructed the jury that the defendant bore the burden of proving by a preponderance of the evidence that he was incompetent. (§ 1369, subd. (f); Evid. Code, §§ 502, 606.)

We caution trial judges not to uncritically rely on the language of CALJIC No. 4.10 (1984 rev.). The language of the instruction incorrectly assumes that the burden of proof will always be on the defendant. As we have explained, the burden of proof will be on the prosecution when the prosecution is the only party seeking a finding of incompetence. On occasions when neither party seeks a finding of incompetence and instead the

trial court assumes the burden of producing evidence of incompetence, a court will be presented with the type of "occasion" contemplated in Evidence Code, section 502 (see fn. 14, *ante*) in which the court should not instruct the jury that either party has the burden of proof. Rather the proper approach would be to instruct the jury on the legal standard they are to apply to the evidence before them without allocating the burden of proof to one party or the other.

■ Defendant's claim that the presumption of competence codified in section 1369, subdivision (f), denied him due process of law by irrationally allocating the burden of proving incompetence to someone who may not have been able to assist his attorney prior to and during the hearing has been expressly rejected by the Supreme Court in *People* v. *Medina* (1990) 51 Cal. 3d 870 [274 Cal.Rptr. 849, 799 P.2d 1282]. In so doing the Supreme Court recognized that the cases from other state and federal jurisdictions are in conflict on the constitutional propriety of placing on the defendant the burden of proving his own incompetence. Relying on *Leland* v. *Oregon* (1952) 343 U.S. 790, 798-799 [96 L.Ed. 1302, 1308-1309, 72 S.Ct. 1002] which upheld a state statute imposing on the defendant the burden of establishing his own insanity, despite the possibility that his mental condition may well prevent an effective showing, and agreeing with *Lowenfield* v. *Phelps* (5th Cir. 1987) 817 F.2d 285, 294, which upheld a Louisiana statute that placed on defendant the burden of proving incompetence to stand trial, the Supreme Court held that the presumption of competence and resultant allocation of the burden of proof to a defendant under California's statutory scheme affords due process under both the federal and state Constitutions. We accordingly also reject defendant's contention.

## III

### NOT GUILTY BY REASON OF INSANITY PLEA *

. . . . . . . . . . . . . . . . . . . . .

## IV

### SENTENCING ISSUES

Under section 667.7, any person convicted of a felony in which the person inflicted great bodily injury or personally used force likely to produce such injury who has served two prior separate prison terms for, inter

---

* See footnote 1, *ante*, page 444.

alia, ". . . robbery involving the use of force or a deadly weapon . . . is a habitual offender" who shall be punished by imprisonment in state prison for life and be ineligible for parole for 20 years.

Defendant was determined to be a habitual criminal and sentenced to consecutive indeterminate life terms under section 667.7, as to counts II and III. His habitual offender status was based on two prior separate prison terms charged as special allegations in the second amended information. The alleged prior prison terms were a June 3, 1982, conviction for assault (great bodily injury) with a deadly weapon accompanied by a special allegation of use of a firearm and an April 4, 1966, conviction of robbery in violation of section 211. Defendant does not contest the use of his 1982 conviction as one of the two prior convictions necessary to sustain his habitual offender sentence.

At the bifurcated trial on count IV and the special allegations, the prosecution introduced commitment packets, including one for defendant's 1966 robbery conviction. The 1966 commitment packet contained certified copies of the information; a minute order regarding arraignment; the verdict form; a hearing on probation and sentencing; and the abstract of judgment. The information charged defendant with a "violation of Section 211 . . . [Robbery], in that on or about the 6th day of December, 1965, in the County of Orange, . . . , [defendant] did willfully, unlawfully and feloniously rob Laura Jean Logan of money by then and there using a deadly weapon, to wit: a pistol." The verdict form indicated that defendant was found guilty of violating section 211 "as charged", and found the robbery to be in the first degree. Based on this evidence, the jury found defendant guilty of the crime of being an ex-felon in possession of a firearm (§ 12021) and found the allegation under section 667.7 that he had committed a "robbery involving the use of a deadly weapon" in connection with his 1966 conviction to be true.

*Habitual Offender Life Sentences*

When defendant was convicted of first degree robbery in 1966, former section 211a fixed the degrees of robbery as follows: "All robbery which is perpetrated by torture or by a person being armed with a *dangerous or deadly weapon* . . . is robbery in the first degree. All other kinds of robbery are of the second degree." (Stats. 1923, ch. 127, § 1, pp. 270-271, amended Stats. 1961, ch. 1874, § 1, p. 3975, italics supplied.) ▮ Relying on our decision in *People V. Brookins* (1989) 215 Cal.App.3d 1297 [264 Cal.Rptr. 240] (review den. Mar. 15, 1990), defendant argues that there was insufficient evidence to show that he used a "deadly weapon" during the 1966 robbery to sustain his life sentences under section 667.7. We disagree.

At the time of defendant's conviction, first degree robbery could be committed by one who was "armed" with either a "dangerous" or a "deadly" weapon. Under this statutory scheme, it is clear that a conviction for an undifferentiated first degree robbery could not be the basis for a habitual offender sentence under section 667.7. Such is not the case here however. ■ ■ ■ ■ The commitment package provided sufficient evidence to prove that defendant's conviction for first degree robbery "as charged" constitutes a prior prison term for "robbery involving use[18] of . . . a deadly weapon" within the meaning of section 667.7 where the information to which the verdict form referred charged defendant with robbery while "using a deadly weapon, to wit: a pistol."

■ There is no prohibition against referring to the information or the verdict form in the commitment package to elucidate the substance of defendant's prior conviction. ■ "[I]n determining the truth of a prior-conviction allegation, the trier of fact may look to the entire record of the conviction." (*People* v. *Guerrero* (1988) 44 Cal.3d 343, 345 [243 Cal.Rptr. 688, 748 P.2d 1150].) At issue in *Guerrero* was whether a conviction of burglary under section 459 was a serious felony within the meaning of section 667, subdivision (d) and section 1192.7, subdivision (c), which included "burglary of a residence" within the category of "serious felonies". At the time of the conviction, the nature of the building entered during the burglary was not an element of the crime and the judgment of conviction did not necessarily establish its residential character. The record of conviction, however, included an accusatory pleading charging a residential burglary and defendant's pleas of guilty or nolo contendere to these charges. The court overruled *People* v. *Alfaro* (1986) 42 Cal.3d 627 [230 Cal.Rptr. 129, 724 P.2d 1154] which held that proof that a prior conviction was a "serious felony" for the purpose of imposing a five-year enhancement under sections 667 and 1192.7, subdivision (c), was limited to matters necessarily established by the prior judgment of conviction. The court held that the trier of fact may properly look to the entire record of conviction to establish the substance of a prior conviction. (*Id.* at p. 355.) In so ruling, the court implicitly rejected the assertion of the dissent that facts contained in the information are not competent to prove allegations which do not constitute elements of the crime. (*Id.* at p. 360, Broussard, J., dis.; *People* v. *Johnson* (1989) 208 Cal.App.3d 19, 27 [256 Cal.Rptr. 16].) Since *Guerrero*, consideration of a variety of items from the file of a prior conviction have been

---

[18] As we held in *People* v. *Logan* (1987) 190 Cal.App.3d 599 [235 Cal.Rptr. 547], the term "use" in section 667.7, subdivision (a) means more than merely being "armed" with a deadly weapon. We found that "use" means, among other things, "to carry out a purpose or action by means of, to make instrumental to an end or process and to apply to advantage." (*Id.* at p. 606, quoting *People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], internal quotation marks deleted.)

approved as proper, including preliminary hearing transcripts and probation reports. (See generally, *People* v. *Goodner* (1990) 226 Cal.App.3d 609 [276 Cal.Rptr. 542].) ■ Similarly, there is no reason to preclude reference to the information here and its specific charge of use of a deadly weapon.

In *Brookins,* we comprehensively reviewed the meaning of the phrase "deadly weapon." We noted that the distinction between deadly weapons and dangerous weapons had not always been made or drawn at all. On occasion, as in former section 211a, the term "dangerous" had been conjoined with that of "deadly." Some cases treated "the terms as synonymous and the distinction drawn has been between those instruments which are designed to be lethal (such as guns, dirks and blackjacks) and those which are merely used in a lethal way." (215 Cal.App.3d at p. 1305, citing *People* v. *Raleigh* (1932) 128 Cal.App. 105 [16 P.2d 752], construing former § 211a.) On other occasions, courts treated the words as distinct, because, as in former section 211a, the words "dangerous or deadly" were used disjunctively. In *People* v. *Raner* (1948) 86 Cal.App.2d 107 [194 P.2d 37] for example, the court noted that a dangerous weapon, such as an unloaded gun, is not necessarily a deadly weapon. "The distinction recognized in the cited cases between unloaded guns when used or threatened to be used as bludgeons, and when not so used, is the distinction between unloaded guns as deadly weapons and as merely dangerous weapons. It is a fundamental distinction which should be recognized in the absence of a controlling statutory definition of the word 'deadly.'" (*Id.* at p. 113.)[19] As a result, although the trial court properly determined that defendants had committed first degree robbery based upon the undisputed fact that they were armed with an unloaded gun, it erred in determining that they were ineligible for probation under section 1203 which precluded probation for robbers who were armed or used a deadly weapon. After reviewing these precedents, *Brookins* held that, in the absence of a special statutory definition, the recognized meaning of the term "deadly weapon" is "either an instrument designed to cause death or great bodily injury or as an instrument used in such a fashion as to be capable of causing death or great bodily injury. Under this settled meaning, an unloaded firearm not used as a bludgeon meets neither definition and hence is not a deadly weapon." (215 Cal.App.3d at p. 1307.)

---

[19] Headnote No. 6 in *People* v. *Raner, supra,* 86 Cal.App.2d at page 108 which states that "[a]n unloaded gun which was used in a robbery case solely as a firearm by pointing it at the victim in a threatening manner, and not as a bludgeon or club, was a deadly weapon within the meaning of Pen[al] Code [section] 211a" is an inaccurate summary of the case. The text to which it refers states that the crime of assault with a deadly weapon (§ 245) is not committed where there is no attempt to use an unloaded gun as a bludgeon. The court then concluded that "for the purposes of sections 211a and 1203, . . . the defendants were armed with a dangerous weapon but not with a deadly weapon." (86 Cal.App.2d at p. 113.)

Unlike the situation now before us, the application of this principle to the facts in *Brookins* required that defendant's life sentence be vacated. The prior conviction upon which defendant's life sentence was partially based was a conviction for robbery while "personally using a firearm" subject to a two-year enhancement under section 12022.5. The prosecution "adduced no facts in the record" from which it could be determined that the firearm was a deadly weapon as a result of being either "loaded (and thus per se deadly) or . . . used in a lethal manner . . . ." (215 Cal.App.3d at p. 1308.) The "mere fact the defendant was convicted of robbery with a gun use enhancement implies nothing about whether the gun was loaded or whether it was used as a bludgeon." (*Id.* at p. 1304.)

By contrast, the information contained in the record of conviction here specifically charged that defendant committed the robbery while using a "deadly weapon." It did not incorporate the general disjunctive language "deadly or dangerous" utilized in former section 211a. The selection of the technical term "deadly weapon" is not to be disregarded as irrelevant surplusage. In *Brookins*, we rejected the People's invitation to interpret the Legislature's use of the undefined term "deadly weapon" in section 667.7 in a manner inconsistent with its established meaning. "[U]nder well-established judicial interpretation," the undefined term " 'deadly weapon,' . . . does *not* include unloaded guns in the absence of facts showing actual use of the unloaded gun as a bludgeon. Given its well settled meaning we must presume that the Legislature used the term in its technical sense and in the consistent manner in which it has been interpreted. [Citations.]" (215 Cal.App.3d at p. 1308.) Similarly, we presume that the selection of the term "deadly weapon" in the charging document was consistent with this established meaning and that the trial court correctly instructed the jury according to this meaning.

Defendant's argument that he had no incentive to challenge the use of the term "deadly weapon" in his 1966 conviction is without merit. Both defendant and the state had an important incentive to contest the designation of his first degree conviction as based on the use of a "deadly weapon," rather than the generalized disjunctive language of section 211a. At the time of this conviction, section 1203 provided that "[e]xcept in unusual cases where the interest of justice demands a departure from the declared policy, no judge shall grant probation to any person who shall have been convicted of robbery, . . . and who at the time of the perpetration of said crime . . . was himself armed with a deadly weapon . . . ." As recognized in *People* v. *Raner, supra,* 86 Cal.App.2d at page 113, under section 1203, probation is within the discretion of the court only where the weapon was "dangerous." The court is powerless to grant probation "only where the defendant was armed with a deadly weapon." In a parallel context, it has been held that

where a defendant's prior convictions occurred after the enactment of the enhancement provisions of section 667, defendant had ample reason to contest crucial allegations contained in the information which, if uncontested, would subject him to such sanctions. In such circumstances, the allegation cannot be considered superfluous. (*People* v. *Johnson, supra,* 208 Cal.App.3d at pp. 24-25.) In this case, it challenges belief to suggest that defendant did not have an interest in establishing an essential precondition to his right to probation. Significantly, the record of conviction demonstrates that probation was denied and defendant was committed to state prison.

 On appeal, we must " 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 611 [244 Cal.Rptr. 200, 749 P.2d 854], citing *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Our examination of the entire record of defendant's 1966 conviction leads us to conclude that there was sufficient evidence that defendant used a "deadly weapon" during the commission of that offense. Given the established meaning of the term "deadly weapon," we must presume that it was used in its technical sense as a loaded gun or one used in a lethal fashion in the information charging the 1966 robbery, that the court properly instructed the jury and that the jury found those facts to be true when it found defendant guilty of first degree robbery "as charged." Accordingly, defendant's life sentences are affirmed.

*Multiple Life Sentences*

 Defendant argues that he should not have been sentenced to more than one life term based on the same prior convictions and that the court erred in imposing two consecutive life sentences for counts two and three. We disagree.

In *People* v. *Decker* (1988) 199 Cal.App.3d 694 [245 Cal.Rptr. 40], the court affirmed a judgment imposing four consecutive fifteen-year-to-life terms under section 667.51, subdivision (c) (currently subd. (d)) following his convictions of four counts of lewd or lascivious acts and findings of two prior convictions within the meaning of section 667.51, subdivision (c). The court held that the statute provides for a term of imprisonment and not an enhancement and that there was no violation of section 654, prohibiting double punishment for the same act or omission. The court reasoned that section 654 "prohibits multiple punishment under different code provisions

for a single 'act or omission.' [Citation.] Nothing in that section prohibits the use of the same priors to determine the appropriate sentence on more than one present offense. Section 667.51, subdivision (c), like other recidivist punishment statutes which impose increased sentences for repeat offenders, merely specifies the applicable sentence upon the present conviction for one with a certain criminal history. It is the current offense which calls for the penalty, the magnitude of which is attributable to appellant's status as a repeat offender. (*People* v. *Jackson* (1985) 37 Cal.3d 826, 833 . . . .) That status, which is based on prior convictions, existed at the time he committed each offense. While the status calls for the increased sentence, it is the new criminal conduct rather than the status which is being punished. Therefore, section 654 does not apply." (*Id.* at p. 698.)

The reasoning in *Decker* is equally applicable to section 667.7, which speaks not of enhancement but of a separate term of imprisonment for recidivist conduct. Both section 667.51, subdivision (d) and section 667.7 impose an indeterminate life sentence for specified offenses where a defendant has suffered two or more prior convictions and/or imprisonments for the offenses. Each of defendant's two new convictions for assault with a deadly weapon causing great bodily injury, which involved separate victims and separate locations, independently qualified for punishment under section 667.7.

Defendant's reliance on *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273-1274 [232 Cal.Rptr. 849, 729 P.2d 115], is misplaced. There, defendant was charged with six multiple-murder special circumstances based on three murders, two witness-killing special circumstances based on one of the killings, and three prior murder special circumstances based on one admitted prior murder. The court held it to be error to charge 11 special circumstances instead of 3. The court found that section 190.2, subdivision (a)(10), addresses two separate situations in which a witness related killing will be a special circumstance, but that evidence supporting findings on both theories permits the charging of only one special circumstance. It then held that regardless of the number of persons murdered or the number of prior murder convictions suffered, the prosecution could only charge one special circumstance under section 190.2, subdivision (a)(3) (multiple murder) and one special circumstance under section 190.2, subdivision (a)(2) (prior murder conviction). The rationale underlying this holding was that additional special circumstances improperly inflate the risk that the jury will arbitrarily impose the death penalty. This reasoning bears no relation to a sentence imposed under the habitual offender statute.

*Determinate Sentence for Counts II, III, and the Prior Serious Felony Convictions*

In addition to properly sentencing defendant on counts II and III to two consecutive life terms pursuant to section 667.7, the court imposed a determinate sentence on each of those same counts and ordered the terms to run concurrent with the life terms. The court also imposed a determinate sentence of ten years for the same two prior serious felony convictions he relied on for imposing the life terms specified in section 667.7. Respondent concedes that this was error.

Section 667.7, subdivision (a)(1), provides in part that "[a] person who served two prior separate prison terms shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 20 years, or the term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, whichever is greatest . . . ."

The sentencing scheme for recidivist offenders set forth in section 667.7 is two fold. It first provides that defendant will serve a life sentence rather than the determinate sentence he would otherwise receive but for his status as a repeat offender. As noted earlier, the life sentence provided for in section 667.7 is a term of imprisonment rather than an enhancement. (*People* v. *Decker, supra,* 199 Cal.App.3d at p. 698.) Secondly, the scheme provides for a parole eligibility date which takes precedence over the minimum parole eligibility period provided for in section 3046.

■ The court was correct in arriving at an aggregate determinate term which included the determinate sentence he would have imposed on counts II and III and all applicable enhancements, but he was not authorized to impose those portions of the aggregate determinate term that pertained to counts II and III. Such aggregate term merely serves the purpose of enabling the Board of Prison Terms to arrive at defendant's parole eligibility date under the provisions of sections 667.7 and 3024.[20]

---

[20] Section 667.7 subdivision (a) (1) provides: "A person who served two prior separate prison terms shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 20 years, or the term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 190 or 3046, whichever is greatest. The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 shall apply to reduce any minimum term in a state prison im-

■ The court also erred in imposing a five-year determinate sentence for each of the two prior serious felony convictions. Section 667, subdivision (a), provides a five-year enhancement for each of the serious felony convictions found to be true in this case. Subdivision (b) of that section sets forth a limitation on the application of the enhancement. Subdivision (b) provides in part that "[t]his section shall not be applied when the punishment imposed under other provisions of law would result in a longer term of imprisonment."[21] As previously noted by this court in *People* v. *Lobaugh* (1987) 188 Cal.App.3d 780, 784 [233 Cal.Rptr. 683], section 667.7, subdivision (b), requires the court to determine whether the aggregate term to be imposed, including a section 677 enhancement, is longer than that resulting from other provisions of law. If it is then the 667 enhancement is applicable. Here, the life sentence provided for in section 667.7 constitutes an "other provision of law" which results in a longer term of imprisonment and will accordingly prevail over the section 667 enhancements.

■ A sentence not authorized by law is subject to correction whenever the error comes to the attention of the trial court or a reviewing court. (*People* v. *Serrato* (1973) 9 Cal.3d 753, 763 [109 Cal.Rptr. 65, 512 P.2d 289].) In such case, the sentence, or at least its unlawful part is void. (*In re Sandel* (1966) 64 Cal.2d 412, 417-419 [50 Cal.Rptr. 462, 412 P.2d 806].) ■ Accordingly, the determinate sentence imposed on counts II and III, and the two 5-year enhancements imposed for the prior serious felony convictions are void and will be stricken.

---

posed pursuant to this section, but the person shall not otherwise be released on parole prior to that time."

Penal Code section 3046 provides: "No prisoner imprisoned under a life sentence may be paroled until he or she has served at least seven calendar years or has served a term as established pursuant to any other section of law that establishes a minimum period of confinement under a life sentence before eligibility for parole, whichever is greater. Where two or more life sentences are ordered to run consecutively to each other pursuant to Section 669, no prisoner so imprisoned may be paroled until he or she has served at least seven calendar years, or has served a term as established pursuant to any other section of law that establishes a minimum period of confinement under a life sentence before eligibility for parole, on each of the life sentences which are ordered to run consecutively, whichever is greater. The Board of Prison Terms shall, in considering a parole for a prisoner, consider all statements and recommendations which may have been submitted by the judge, district attorney and sheriff, pursuant to Section 1203.01, or in response to notices given under Section 3042, and recommendations of other persons interested in the granting or denying of the parole. The board shall enter on its order granting or denying parole to these prisoners, the fact that the statements and recommendations have been considered by it."

[21] Section 667, subdivision (b), provides: "This section shall not be applied when the punishment imposed under other provisions of law would result in a longer term of imprisonment. There is no requirement of prior incarceration or commitment for this section to apply."

## Disposition

The judgment is modified. Defendant's determinate sentence on counts II and III, and the two 5-year enhancements imposed for the prior serious felony convictions are stricken. The trial court is ordered to prepare a corrected abstract of judgment in accordance with this opinion and will send a copy to the Department of Corrections. In all other respects, the judgment is affirmed.

Marler, J., concurred.

**BLEASE, Acting P. J.,** Concurring and Dissenting.—I concur in the judgment and opinion except for part IV, as to which I dissent.

In part IV the majority opinion upholds the judgment of sentence predicated upon the finding that defendant was a habitual criminal within the meaning of Penal Code section 667.7, subdivision (a) and therefore subject to a term of life imprisonment.[1] It does so on the theory that defendant's 1966 conviction of first degree robbery (former § 211a) is within section 667.7 because it constitutes an adjudication that he used a *loaded* pistol in the robbery. The sole basis for that conclusion lies in a single excerpt from the record of the 1966 case, that the jury found defendant guilty "as charged," that he did "willfully, unlawfully and feloniously rob Laura Jean Logan of money by then and there using a deadly weapon, to-wit: a pistol." Since this record will not sustain the conclusion I dissent.

In *People* v. *Brookins* (1989) 215 Cal.App.3d 1297 [264 Cal.Rptr. 240] we held that "deadly weapon," as the sole term of art regarding robbery by means of a weapon in section 667.7, subdivision (a), refers to a loaded weapon or a weapon used as a bludgeon. We concluded that this test was not satisfied by evidence the defendant was convicted of a robbery with an enhancement for gun use under section 12022.5 because "firearm," as used in that section, is not limited to a loaded weapon. Similarly, it cannot be determined on the record in this case whether the gun employed in the 1966 robbery was loaded or used as a bludgeon.[2] *Brookins* was resolved as a definitional question, turning on the meaning of a statute, section 12022.5. Similarly, this case turns on the meaning of "deadly weapon," as used in former section 211a. It also turns on the significance to be attributed to a conviction under former section 211a for the use of a weapon so characterized in the charging papers.

Defendant was convicted in 1966 pursuant to the definition in former section 211a that "[a]ll robbery which is perpetrated by torture or by a

---

[1] All references to statutes are to the Penal Code.
[2] Hereafter I use term "loaded weapon" to refer to these disjunctive possibilities.

person being armed with a dangerous or deadly weapon . . . is robbery in the first degree." (Stats. 1961, ch. 1874, p. 3975.) The majority opinion relies upon a single case for its interpretation of this language, *People* v. *Raner* (1948) 86 Cal.App.2d 107, 113 [194 P.2d 37]. In that case the court said "[t]he distinction . . . between unloaded guns when used or threatened to be used as bludgeons, and when not so used, is the distinction between unloaded guns as deadly weapons and as merely dangerous weapons." The majority opinion seizes upon this distinction, reasons that the term "deadly weapon" employed in the 1966 charging document must reflect this distinction, and concludes that defendant must have been *convicted* of using a loaded pistol.

The first difficulty with this reasoning is that there is a line of cases interpreting former section 211a which does not make this distinction. In *People* v. *Raleigh* (1932) 128 Cal.App. 105 [16 P.2d 752] the court distinguished between two classes of dangerous or deadly weapons, rather than a class of dangerous and a class of deadly weapons. In *Raleigh* the terms "dangerous weapon" and "deadly weapon" were treated as synonymous. It distinguished between instruments designed to be lethal ["guns, dirks and blackjacks"] and instruments merely used in a lethal way. On this point *Raleigh* has been followed by the California Supreme Court, while *Raner* has never been cited for its distinction. Thus, the best that can be said for the majority argument is that the meaning of former section 211a is ambiguous and on that score the defendant is entitled to the benefit of the ambiguity.

The second difficulty is that the reasoning of the majority opinion is built on an unsound premise. Because "pistol" is not qualified by "loaded" in the charging document, the success of the majority theory is dependent, not only upon equating "deadly weapon" with loaded pistol, but upon equating *conviction* for use of a deadly weapon with *conviction* for use of a loaded pistol. This second step is unexamined and cannot be taken. Under former section 211a a first degree robbery was committed regardless whether the weapon employed was "dangerous" or "deadly", hence it was of no consequence to a *conviction* whether the weapon was loaded.

I amplify these arguments.

Section 667.7, subdivision (a)(1) requires imposition of a life term when a defendant has served two prior prison terms meeting the criteria of section 667.7, subdivision (a). The application of this section to defendant is dependent upon the finding he was convicted of a 1966 "robbery involving the use of . . . a *deadly weapon*" as that term is employed in section 667.7, subdivision (a). In this court's decision in *People* v. *Brookins, supra,* 215

Cal.App.3d 1297, upon which the majority opinion relies, we ruled that because the term "deadly weapon" is the *sole* term employed in section 667.7, subdivision (a), it is to be distinguished from a "dangerous" weapon and means therefore "either an instrument designed to cause death or great bodily injury or as an instrument used in such a fashion as to be capable of causing death or great bodily injury." (215 Cal.App.3d at p. 1307.)

We said that "[u]nder this settled meaning, an unloaded firearm not used as a bludgeon meets neither definition and hence is not a deadly weapon." (*Brookins*, 215 Cal.App.3d at p. 1307.) The majority opinion goes wrong in imputing "*this* settled meaning" to former section 211a, for *Brookins* mani-festly did not. Rather, *Brookins* here refers to the settled meaning of the term "deadly weapon" where it is the *sole statutory term* of significance, as with the probation statute at issue in *Raner* or the habitual criminal statute at issue here and in *Brookins*. We expressly noted that there was *no* settled meaning for the term "deadly weapon" in former section 211a. We said: "But the distinction between deadly weapons on the one hand and danger-ous ones on the other has not always been made explicit or even drawn at all. In part, this is so because the term 'dangerous' has sometimes been conjoined with that of 'deadly.' (See, e.g., former Pen. Code, 211a (Stats. 1961, ch. 1874, § 1) [robbery perpetrated when armed with 'a dangerous *or* deadly weapon' was first degree].) On occasion, the cases have treated the terms as synonymous and the distinction drawn has been between those instruments which are designed to be lethal ["guns, dirks and blackjacks"] and those which are merely used in a lethal way. Thus, in *People* v. *Raleigh* (1932) 128 Cal.App. 105 [], in an opinion described in a leading text as 'definitive' ([citing Witkin & Epstein]), the court distinguished between two classes of dangerous or deadly weapons . . . ." (*Id.* at p. 1305.)

As *Brookins* points out, in *Raleigh* the terms "dangerous" and "deadly" were treated as "*synonymous*." For that reason it was said of *Raleigh*: "There can be no doubt at all, in this state, that an unloaded gun can be a 'dangerous' or 'deadly' weapon within the meaning of section 211a." (*People* v. *Ward* (1948) 84 Cal.App.2d 357, 360 [190 P.2d 972].) As *Brookins* notes, *Raleigh* was "quoted with approval in *People* v. *Graham* (1969) 71 Cal.2d 303, 327-329 []." (215 Cal.App.3d at p. 1305.) *Graham*, which is the latest Supreme Court case to visit the subject, follows *Raleigh* in distin-guishing between "two classes of 'dangerous or deadly weapons'" rather than between "dangerous" and "deadly weapons." (71 Cal.2d at p. 327.) *Raleigh* was also quoted with approval in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], decided the year before defendant's trial. *Aranda* does distinguish between "dangerous" and "deadly" weapons, but concludes the distinction is without significance under former section 211a because "[t]he prosecution does not have to prove [inter alia] that the

gun was loaded (*People* v. *Raleigh* []; *People* v. *Egan*, 77 Cal.App. 279, 284 []) . . . ." (63 Cal.2d at p. 532.)

Because of these cases the CALJIC instructions likely applicable during the period of defendant's 1966 conviction make no distinction between dangerous and deadly weapons. CALJIC No. 210-B (rev. ed. 1946) provided simply, based upon *Raleigh, supra*, that: "A 'dangerous or deadly weapon', as the term is used in the law [of § 211a] means any weapon, instrument, or object that is capable of being used to inflict great bodily injury . . . ." The succeeding instruction, CALJIC No. 9.13 (3d ed. 1970), relying on *Raleigh, supra*, and *Graham, supra*, instructed the jury inter alia that: "A weapon such as a gun, dirk or blackjack may be said as a matter of law to be a dangerous or deadly weapon."

And that is exactly how the prosecuting attorney in this case viewed the law of former section 211a. Although not authority for its meaning, it provides anecdotal evidence consistent with the case law and the CALJIC instructions. He told the jury: "In order to come within [§ 667.7] we have to show . . . that he was convicted of a robbery in 1966 involving the use of a firearm, or a deadly weapon. I believe, is the terminology, involving the use of a firearm or a deadly weapon or firearm." He also told them: "With regard to . . . 667(a) . . . . There [are] two kinds of robbery. One is what we call strongarm robbery. Where they just come up and physically take something from somebody. The other is using a deadly weapon, either a gun or a knife and coming up and saying, 'Give me your money.' Classic armed robbery."

None of this is addressed in the majority opinion. Their sole reliance, as noted, is upon *People* v. *Raner, supra*. In *Raner* the defendants were charged, in a manner parallel to this case, "with the crime of robbery while armed with a deadly weapon, to wit, a sawed-off .22 caliber rifle." (86 Cal.App.2d at pp. 108-109.) They "pleaded guilty to the *charge* of robbery but denied having been armed, and waived a jury trial on that issue." (86 Cal.App.2d at p. 109, italics added.) "At the close of the hearing . . . on the applications for probation and for the purpose of fixing the degree of the crime, the trial judge found that defendants had been 'armed with a deadly weapon to wit an *unloaded* pistol at the time of the commission of the offense.'" (*Ibid*.) The court determined the offense to be robbery of the first degree and denied probation solely on the ground of section 1203, which prohibited probation when "armed with a deadly weapon."

On appeal the court did distinguish between "unloaded guns as deadly weapons and as merely dangerous weapons," the former being the case only when the gun "was used or threatened to be used as a bludgeon." (*Raner*,

86 Cal.App.2d at p. 113.) However, this distinction proved to be of significance only with respect to the granting of probation under section 1203. As the court said of the conviction: " 'To fix it as of the first degree, it is not necessary that the weapon should be a deadly weapon, if, in fact, it is a "dangerous" weapon. (Pen. Code, § 211a.) Robbery committed with an unloaded pistol may be robbery of the first degree.' " (86 Cal.App.2d at p. 112; quoting from *People* v. *Coleman* (1942) 53 Cal.App.2d 18, 28 [127 P.2d 309].)

Thus *Raner* essentially has to do with eligibility for probation. "We reach the conclusion, therefore, that for the purposes of sections 211a and 1203, . . . the defendants were armed with a dangerous weapon but not with a deadly weapon. The trial court's determination that the offense was robbery in the first degree was therefore correct (Pen. Code, § 211a), although based upon the erroneous premise that defendants were armed with a deadly weapon. [But] Defendants were in no way prejudiced by this error . . . and we do not understand either of them to seriously argue that it is ground for reversal of the judgment. On the other hand, the court's conclusion that under section 1203 it was powerless to grant probation was not only erroneous, since the prohibitory provisions of that section are applicable only where the defendant was armed with a deadly weapon, but . . . deprived defendants of the substantial right, . . . to have their applications for probation considered and determined by the court in the exercise of its legal discretion." (86 Cal.App.2d at p. 113.) For these reasons the court affirmed the judgment of *conviction* but reversed the judgment of sentence. (*Id.* at p. 114.)

The flaw in the majority reasoning is that if the *Raner* conviction were at issue in this case and the sole evidence tendered were the record of the charge and conviction in that case we could not conclude that the gun employed was loaded. The majority opinion does not discuss this anomaly. Rather, it argues that the defendant had an incentive in the 1966 action to litigate whether the pistol was loaded, i.e., whether it was "deadly" or merely "dangerous," because of the provision of section 1203 that allowed probation in the discretion of the court only in cases where the weapon employed in the robbery was "dangerous." For that reason, in *Raner*, although the conviction was affirmed, the judgment of *sentence* was reversed and the case remanded so that the court could "hear and determine defendants' . . . applications for probation . . . ." (86 Cal.App.2d at p. 114.)

The majority's premise is that, based upon *Raner*, the defendant had an incentive to "litigate" whether he was guilty "as charged" of using a "deadly" weapon because if so "convicted" he would be ineligible for probation.

But in *Raner* the trial court upheld the conviction predicated upon a charge of using a "deadly weapon" although defendants used an unloaded pistol for the reason that it made no difference to a conviction for first degree robbery whether the pistol was loaded or not. But because the gun was not loaded the result in *Raner* is that the defendants did *not* "litigate" the nicety of the terminology of the charge in order to pursue eligibility for probation for the reason that they had *no* incentive so to "litigate." It was of *no* consequence to the *conviction*.

For this reason the question of probation has nothing to do with this case. Eligibility for probation under section 1203 need not be plead and proved. For that reason there is no necessary connection between the charge and eligibility for probation. And a prosecutor would have no incentive to charge the use of a "deadly weapon" for purposes of invoking section 1203. Thus, the issue is not whether the defendant had an incentive to litigate the distinction between a loaded and unloaded gun in the 1966 action for purposes of probation but whether that distinction was embodied in the *charge and conviction* which constitute the only record before this court. With respect to that question, we are in a posture identical to the *Brookins* case. "Since in this case the prosecution adduced no facts in the record from which we can determine the [pistol] used by the defendant in the [1966] robbery was loaded (and thus per se deadly) or was used in a lethal manner, we cannot say a deadly weapon was used in the commission of the robbery," as required by section 667.7. (*Brookins, supra,* 215 Cal.App.3d at p. 1308.)

I would reverse the judgment of sentence finding the defendant to be a habitual criminal.

A petition for a rehearing was denied May 13, 1991, and appellant's petition for review by the Supreme Court was denied August 1, 1991. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.